### GEORGE v. WISEMAN.
### No. 1650.

Circuit Court of Appeals, Tenth Circuit.
Sept. 6, 1938.

Hal E. Harlan, of Manhattan, Kan. (Lawrence J. Richardson and R. T. McCluggage, both of Topeka, Kan., on the brief), for appellant.

Tinkham Veale, of Topeka, Kan. (James E. Smith, E. H. Hatcher, and Frank H. McFarland, all of Topeka, Kan., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

Reference will be made to the parties as they appeared in the court below. The action is by a woman more than seventy years of age against a man forty-two years old to recover certain bonds in the amount of $140,600—or the value thereof in the event disposition had been made of any of them —and $19,200 in money alleged to have been wrongfully obtained through fraudulent means. The case was tried to a jury; a verdict was returned for plaintiff; judgment was entered; and defendant appealed.

It is argued at length that the action is one in replevin; that the petition falls short of stating a cause of action on the ground of fraud; that the reply may tender such issue limited to the single question whether defendant misrepresented the contents of a written instrument called a deed of gift; that there was no evidence tending to show that he misrepresented the contents of such instrument; that the pleadings do not tender the issues of fiduciary relationship, mental incapacity, or undue influence; and that the court erred in submitting them to the jury. It is alleged in the petition that soon after the parties became acquainted, defendant represented himself to be an experienced bookkeeper and businessman; that he volunteered and assumed to give plaintiff much advice concerning her business affairs; that he volunteered his services and attempted to act as a private and confidential secretary; that she employed him as a chauffeur to drive her pleasure automobile; that he learned she had certain government bonds and other bonds deposited with a trust company in Topeka, Kansas; that he told her on many occasions it would be better and safer for her to segregate some of them and "not put them all in one basket"; that he suggested, requested, and urged her to deliver some of them to him in order that he could place them in his safety deposit box in the Topeka State Bank; that at such times she was sick with a serious illness, was confined to her bed most of the time, and was under the continuous care of a physician; that the illness impaired her physical and mental faculties and made her very easily susceptible to suggestions from other persons, particularly from defendant; that believing his statements to be true, relying upon his advice, and believing that he was acting in good faith and for her best interests, and that he would return the bonds upon request, she delivered them to him for safekeeping; that at the time of such delivery she signed a written instrument of some kind which had been prepared by him or some other person at his request, the exact nature of which she did not know either at the time of its execution or at the institution of the suit; that his statement that he had a safety deposit box in a bank in which he would deposit such bonds for

safekeeping was false and untrue; that after the delivery of the bonds she was restored to improved health and requested their return; and that he thereupon claimed that she had made a gift of them to him and refused to return them. The answer denies that the bonds were delivered for safekeeping. It affirmatively alleges that plaintiff made an outright gift of them to defendant and invested him with the legal and equitable title to them; that she executed a written instrument of conveyance, a copy of it was attached; and that she was a woman of strong mentality and was in full possession of her mental faculties at the time of the gift. The reply avers that at about the time the bonds were delivered to defendant, he stated to her that it would be necessary for her to sign a writing in order that the bonds could be removed from her deposit box and placed in his; that he had a paper prepared and requested her to sign it; that she signed it without reading it, believing his statements that it was merely to enable him to remove the bonds; that she did not know its nature or significance; and that if the instrument pleaded in the answer was the one she signed, her signature was obtained through fraud. Perhaps with a full measure of care and aptitude the pleadings could have been drawn with more skill, but they tender the issues of fiduciary relationship, mental weakness, and undue influence as elements entering into the fraud in the procurement of the instrument of conveyance and the delivery of the bonds; and the case was tried throughout upon that theory.

The action of the court in submitting such issues to the jury is challenged for want of substantial evidence tending to establish them. The testimony presented sharp conflicts, but there was substantial evidence which tended to establish these facts. The husband of plaintiff died about four years prior to the time of the transaction which gives rise to this controversy. She and her husband had lived at the Jayhawk Hotel in Topeka several years immediately preceding his death, and she continued to live there afterwards. She owned a planing mill and a number of residential properties in Topeka; she had bonds in the aggregate of $450,000 and $15,000 in currency in a deposit box in the Central National Bank of that city; and she had money on deposit in a checking account in the bank. Defendant was employed as desk clerk at the hotel from March 2 to December 1, 1935. Plaintiff and defendant became acquainted at the desk soon after he began as clerk, and they developed a friendship to the extent that they frequently dined together and on one occasion he joined others in playing bridge in her room. He told her that he did not like his work at the hotel and wished to get away from it; that he expected to lose his job any time; and that he would like for her to let him drive her automobile. She employed him as her chauffeur at an agreed salary of $100 per month beginning December 2, 1935. Soon thereafter they made a trip to California in her car, remained there a few days, and returned to Topeka in order that she could give attention to some business. She again made her residence at the Jayhawk Hotel and he stopped there also. In February they again motored to California, went from there to Honolulu, and returned to Topeka about the middle of March. She resumed her residence at the hotel and he again stopped there. She paid his expenses at the hotels in Topeka, California, and Honolulu, in addition to his salary. He told her that he had been informed before they met how rich she was; he frequently suggested that she tell him about her business; and upon her declination, he stated repeatedly that she did not trust him and for that reason would not tell him. She was stricken with apoplexy at the hotel sometime in April and was confined to her bed for about two weeks, during which period she was under the care of a physician. Her left arm and left leg were partially paralyzed, her mouth drooped on one side, and her left eye was drawn. It was the opinion of the physician that she suffered a hemorrhage of the brain of a type which dulls the mentality and lessens the resistance of the patient, which is very slow in correcting itself and usually requires from two weeks to six months for recovery. In talking with the physician she was unable at times to answer his questions and sometimes she would not express herself understandably. On one occasion she failed to recognize the person who had been manager of the planing mill for twenty years, and in talking with him on different occasions she would repeat a question which had been asked and answered just a few minutes previously. It was the opinion of the physician that at one time during her illness she did not know who her relatives were; and based upon his long acquaintance with her, it was the opinion of the manager of the mill that the stroke weakened her

and that she was irrational at times. Defendant ordered their meals and they ate together in her room. At the suggestion of defendant and the physician, about the first of May she was removed from the hotel to a residence which she owned in Topeka. Defendant and a woman attendant went along. Soon thereafter she suffered a slight intensification of the stroke. The woman attendant was later discharged and defendant went to Liberty, Missouri, his old home, and employed Leta Andrews, a woman he had known for many years, to come to Topeka and act as nurse for plaintiff. Due to the weakened condition of plaintiff, she and the nurse occupied a room on the first floor of the residence, and defendant occupied one on the second floor. Defendant told her on one occasion that he thought a bank was not a safe place at which to keep securities in those days; she replied by asking where she could keep them; he suggested that "rather than have all of her eggs in one basket" perhaps she should let him place some of them in a box he had in a bank in Topeka; and he made the suggestion more than once. The time came when she thought some coupons should be clipped from the bonds. She directed defendant to go to the bank and get the contents of the box and bring them to the residence. He replied that they would not let him have them, and she thereupon wrote a note to the vice-president of the institution directing that the contents of the box be delivered to defendant. Defendant presented the note. The vice-president called her on the telephone and inquired whether she wished the bonds delivered to defendant and she answered in the affirmative. He then suggested that he come to the residence with defendant; that was agreed upon; the contents of the box were delivered to defendant; he placed them in a sack; and the two went to the residence. Defendant drove the car to the rear of the residence and they entered from the rear; the vice-president went to the front room where plaintiff was sitting in a chair; and defendant took the sack with its contents upstairs. The vice-president asked the purpose of having the securities brought to the residence; she replied that she had not been able to go to the bank for some time; and that she wished to see what was there, and what coupons were due. He told her that it was dangerous to keep them at the residence overnight and suggested that they be returned to the bank. Defendant had entered the room in the meantime. She stated that she could take care of the bonds, and defendant said the same thing. The vice-president told her that perhaps she should place the securities in a trust for safekeeping and suggested that she consult her attorney. She replied that she did not have anything to do with attorneys; that she did not want attorneys or politicians to know anything about her business and inquired whether he knew someone who could take care of the matter for her. He replied that a young man named Pitcher in the trust department of the bank was familiar with such matters and that he would be glad to come to the residence and talk with her about it. She stated that she would think it over until the following morning, and then consented that the securities be returned to the bank. The vice-president and defendant took them back, and on the way defendant stated that plaintiff intended to give him some of them, or that she wanted him to have some of them. Defendant was at the bank early the following morning. He introduced himself to Pitcher; stated that the vice-president had suggested that plaintiff establish a trust; and that plaintiff desired to know more about it. Pitcher suggested that he go to the residence and talk with her; but defendant replied that she had been ill, that she was unable to get around very well, that upon her instructions Pitcher was to tell him about it, and that he would relay the information to her. Pitcher explained the matter. In doing so, he inquired what provision was to be made for relatives and defendant said none. Defendant then went into the deposit box, took out the contents, and left. He returned that afternoon with a bag and went into the vault; after coming out he told Pitcher that he had explained the matter to plaintiff and that she preferred a revocable trust. He had a black book with him and said it was her record book; he expressed amazement at the amount of property in her safety box, and stated that she was thinking of putting $300,000 of government bonds in a revocable trust. He further stated that while he and plaintiff had been working with the bonds she told him that she was going to give the balance of them to him, which figured up $140,650; he talked about the gift; and he directed Pitcher to proceed with the preparation of the agreement. Pitcher stated that he was in position to prepare such an agreement, but would have to talk with her before it was completed. De-

fendant returned to the bank the following morning and inquired whether the trust agreement was ready. He said that he was going into the vault to separate the bonds into the $300,000 to constitute the trust and the $140,650 to constitute the gift, and wanted someone in the bank to help him. Pitcher and another employee and defendant made the separation. Defendant then rented a safe box and placed the $140,650 of bonds in it. Defendant again asked Pitcher about the trust agreement, and Pitcher replied that he should talk with plaintiff before taking any further steps, to which defendant rejoined that she did not care much about meeting people and that he would talk with her about it. He called on the telephone a few minutes later and said that she would see Pitcher at eleven o'clock that morning. Pitcher went to the residence; defendant met him outside and told him that the manager of the planing mill was inside talking with plaintiff and that she would prefer for him to wait until she finished. Pitcher and defendant walked around the house and waited until the manager departed. Pitcher then went inside and introduced himself. She said that she had been ill, but that the doctor released her that morning and that she was well. Pitcher then mentioned the trust, and she said that defendant had explained it to her. Pitcher explained it and she said she understood it thoroughly. He suggested that he collaborate with her attorney, to which she replied that she did not want attorneys or politicians to know anything about it. She stated that she desired to place $300,000 in bonds in a living, revocable trust with provision that upon her death the entire trust property should go to defendant. Having finished the discussion of the trust agreement, Pitcher inquired what she was going to do with the remaining $140,650 of bonds; she said she was going to give them to defendant, that he was to have possession of them, the right to clip the coupons, and the right to dispose of them. Pitcher returned to the bank and prepared a trust agreement and a deed of gift. He and two others from the bank took them to the residence. Defendant and the nurse were in the room. In the presence of all of them, Pitcher read the instruments and explained them to her. When he reached the point in one of them where the amount was stated, she held up her hand to stop him. He passed over the amount, but read the balance. She said she understood them and signed them. The nurse from Liberty acted as one of the witnesses, and one of the employees of the bank administered the acknowledgment. Plaintiff then stated that it seemed she was doing all of the signing and asked what defendant was to sign. Pitcher inquired whether she wished defendant to sign some kind of a contract. She replied that they did not need a contract; that they had an understanding; but that he should sign something. Pitcher asked if she meant a receipt for the bonds; she replied in the affirmative; he thereupon endorsed a receipt on the original instrument of gift; defendant signed it; and the instruments were delivered. Within a short time defendant clipped certain coupons from the bonds and deposited the proceeds aggregating approximately $25,000 to his credit in the bank. Plaintiff and defendant agreed that each should have a key to the bank box of the other, and he gave her a key to the box that he rented in which he placed the so-called gift bonds. They went to the bank together a few days after the execution of the instruments. She stated that it seemed she had made a great mistake and wanted defendant to return the bonds. An officer of the bank said that he thought they should be returned. Defendant said that the request came suddenly and that he desired twenty-four hours in which to think it over. He asked plaintiff whether he had done everything the way she directed and wanted it done. She replied in the affirmative, and they departed together. Soon thereafter he told her that the attorney who had represented her husband for many years prior to his death and had acted for her since, intended to have her adjudged incompetent in order to take over the administration of her affairs. She expressed surprise and was frightened. The two again went to the bank together. She revoked the trust, withdrew the trust bonds of $300,000 and her deposit of more than $20,000 in cash; he withdrew the so-called gift bonds of $140,650; they took them to Liberty, Missouri, his home, and placed them in a safe box in a bank there. She stayed at the home of his relatives while they were there. Some time later the two of them and the manager of the planing mill went to Liberty and brought the bonds back to Topeka.

Plaintiff had a will which had been in effect several years. Defendant suggested that she make a new one and stated that if she should die without a will her prop-

erty would go into a school fund. At her direction he brought the will downstairs; they discussed the matter; he made some notes, and went to the office of the attorney whom he had told her intended to have her adjudged incompetent and told him she desired that he prepare a new will for her. He furnished the attorney the substance of the notes and may have left them in the office. Under the terms of the proposed will an undivided half interest in the planing mill and certain other properties were bequeathed to him. After leaving the office of the attorney, he had a photostat made of the old will and placed it in his safe box at the bank, all without the knowledge of plaintiff. The attorney went to see plaintiff about the new will, and in the course of the conversation asked about the bonds; she said care had been taken of them; and he then asked defendant about them and he made like answer. The new will was never executed. Defendant wrote the word "void" and the date on the old one; she placed her initials on it; and she then tore off her signature.

Defendant took the so-called gift bonds to Salina, Kansas, and kept them there for some time in safe boxes rented under the names of third persons. He left the home of plaintiff in August; she first learned that he was going about three hours before his departure; and he was married to his second wife three days later. He went to Denver and remained about two weeks; thence to Los Angeles and remained a week; thence to San Antonio and remained about a week; thence to Dallas and remained three or four days; thence to Galveston and remained probably a week; thence to Miami and remained ten days or two weeks; thence to Kansas City, arriving in September and remaining until December; thence again to Miami and remained about a month and a half, and while there he made a trip to Cuba; and thence back to his home in Missouri. He has made disposition of some of the bonds but still has some; he lent a sister about $12,000 with which to buy a farm in Missouri; he delivered about $25,-000 to a brother-in-law in Missouri with which to buy a farm, but it was not purchased and at the time of the trial the money was still in the custody of the relative; he made two unsecured loans aggregating $28,-000 to a merchant in Salina, delivering that amount in currency; he paid $9,000 to his attorney; and he spent about $33,000 within approximately a year.

Plaintiff testified in detail respecting her mental and physical condition. She said that after the stroke she did not have any strength or courage left and could not remember many things which others stated had occurred. She said that she did not make a gift of the bonds; that they were delivered to defendant for safekeeping and with the understanding that he would return them; that she did not direct defendant or the bank to have any papers prepared; that she did not read the instruments at the time they were signed; that she thought they were in furtherance of their understanding; that she did not know what a trust agreement or bill of sale was; and that she never gave the currency (hereinafter referred to) to defendant and first learned from his testimony that he had taken it. Defendant testified in detail that he acted throughout under the direction of plaintiff; that she expressly gave him the bonds and the currency; and that she directed him to have the new will prepared and to write the word "void" and the date on the old.

The jury was well warranted in finding from the evidence and the sustainable inferences to be drawn from it that a fiduciary relationship existed between the parties; that while she was in a weakened mental and physical condition and without power of resistance, he overreached her, and through the designed exercise of undue influence brought about the execution of the instrument of gift and fraudulently obtained the bonds and cash. Cases abound in which recovery was awarded upon less evidence of fraud than is present here. The evidence required submission of the issues and supports the verdict.

Error is assigned upon the action of the court in allowing plaintiff to file her supplemental petition during the trial in which she sought recovery for the two sums of currency aggregating $19,200; and in denying defendant a continuance after the pleading had been filed. Defendant testified that there was a package in the deposit box which contained $15,000 in currency; that he placed it in the sack with the securities and took it to the residence and thence upstairs; that plaintiff directed him to take everything out of the sack except the securities and to bring them downstairs to her; that he did so, leaving the currency upstairs; that she later inquired how much it was; that he told her, and she expressly made a gift of it to him; that on a different

occasion she told him there was some money in a corset upstairs and made a gift of it to him; that he found the money sewed in the corset, took it out, and learned that it amounted to $4,250. She testified that she never gave the money to him and did not know that he had taken it until he so testified; and her counsel stated to the court that they first learned of its existence and that defendant had taken it when he testified about it. The supplemental pleading merely increased the amount for which recovery was sought. As already indicated, defendant had testified fully in respect to the circumstances in which he acquired possession of the money; and there is no indication that the contents of the pleading took him by surprise, or that he was unprepared to meet it, or that he could produce additional evidence if granted a continuance. The matter of permitting an amendment during the trial, and of allowing or denying a continuance as the result rests in the sound discretion of the trial court; and its action will not be disturbed on appeal unless there was an abuse of discretion. No abuse of discretion occurred in this instance. The court was within the appropriate exercise of its discretion. The contention is without merit.

█ █ It is also contended that the court fell into error in permitting plaintiff to reopen her case for the purpose of introducing additional evidence concerning the disposition which defendant had made of some of the bonds and the money. Likewise, the matter of permitting a party to reopen his case for the purpose of introducing additional evidence is within the discretion of the court; and it cannot be said that there was an abuse of such discretion in this instance.

█ Many complaints are directed to the instructions given and to the refusal to give requested instructions. The most serious contention relates to an instruction to the effect that the burden rested upon plaintiff to prove that a fiduciary relationship existed; that she was in a weakened mental and physical condition; that she was easily susceptible to suggestions from defendant; and that she relied upon him for advice, believed his statements, and believed that he was acting in good faith and for her best interests; but that if these facts had been established, the burden rested upon defendant to show the fitness and honesty of the transaction and that the conveyance was made for an adequate consideration. It is

said that a consideration is not essential to the validity of a gift and that the instruction was erroneous for the reason that it cast the burden upon defendant to show that there was an adequate consideration for the transfer. Standing alone and apart from other parts of the instructions, it may be said that the particular instruction improperly cast the burden upon defendant to show an adequate consideration for the transfer. But in other parts of the instructions the court defined a gift to be a voluntary transfer of property without any consideration or compensation; that it cannot be set aside merely because the donor subsequently changes his mind and regrets the transaction, or because the act was improvident, unjust, or undeserved; that plaintiff had the right to make disposition of her property by gift or otherwise; and that if they found that she executed the instrument of transfer with the intention of conveying title to defendant, they should find in his favor. The jury were further told specifically and plainly that before plaintiff would be entitled to recover they must find that defendant falsely and fraudulently represented that he had a safe deposit box, and that if plaintiff would deliver the bonds to him he would keep them safely and return them to her; and further that at the time plaintiff executed the conveyance she believed it was merely for the purpose of enabling him to obtain possession of the bonds for that purpose. No reference was made in these instructions and others to the necessity for any consideration for the transfer. The instructions must be considered as a whole. Parts cannot be separated and treated apart from others. Wisconsin & Arkansas Lumber Co. v. Ward, 8 Cir., 32 F.2d 974; S. S. Kresge Co. v. McCallion, 8 Cir., 58 F.2d 931; Metropolitan Life Ins. Co. v. Armstrong, 4 Cir., 85 F.2d 187; Moran v. City of Beckley, 8 Cir., 67 F.2d 161. Construed as a whole they made it clear to the jury that plaintiff could not prevail if she made a gift of the property, even though no consideration whatever passed; and that she could recover only in the event the transfer was made as the result of fraud on the part of defendant. The issue was made so plain that it could not have been misunderstood. It is inconceivable that the jury returned the verdict in the belief that the donee of a bona fide gift must establish an adequate consideration.

Other parts of the instructions are drawn in question. We have examined them with care and have concluded that the

issues were fairly and accurately submitted, and that there is no merit in the contentions advanced by defendant.

Some of the requested instructions were given. Virtually all of the questions treated in those which were refused had been correctly covered in the instructions of the court. It is not error to refuse a requested instruction even though it is an accurate statement where the subject has been appropriately covered in the instructions given. A court is not required to repeat or reiterate in different form that which has already been given. Bowater v. Worley, 10 Cir., 57 F.2d 970; Detroit Fire & Marine Ins. Co. v. Oklahoma Terminal Elevator Co., 10 Cir., 64 F.2d 671.

We are mindful that the cancellation of an instrument of conveyance for fraud is exclusively within the jurisdiction of equity. But plaintiff pleaded facts which entitled her to recover. Defendant joined issue upon the question of fraud, voluntarily went to trial before a jury, adduced evidence touching the issue, and tendered instructions upon it—all without any suggestion that her proper remedy was to proceed in equity to set aside the instrument. He thus waived the question and acquiesced in the trial of the equitable issue in this action. Cook v. Foley, 8 Cir., 152 F. 41.

The judgment is affirmed.