**MARTIN et al. v. UNITED STATES.**[*]

Nos. 1705–1709, 1717–1719.

Circuit Court of Appeals, Tenth Circuit.

Dec. 7, 1938.

Rehearing Denied Jan. 9, 1939.

[*]Writ of certiorari denied 59 S.Ct. 590, 83 L.Ed. ——.

Jean S. Breitenstein, of Denver, Colo. (Louis R. Stein, of El Paso, Tex., on the brief), for appellants Porter Allbee, Andrew Berns, Carl Ernest Brown, Jack Herring, and Harry W. Martin.

J. H. Boutcher, of Denver, Colo., for appellants Oral V. McMenus, Walter Nisun, and Austin Patton Muzingo.

492

David H. Morris, Asst. U. S. Atty., of Denver, Colo. (Thomas J. Morrissey, U. S. Dist. Atty., of Denver, Colo., and Arthur G. Higgs, Sp. Asst. U. S. Atty., of Washington, D. C., on the brief), for the United States.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

These eight appeals are from convictions for a conspiracy to violate the Motor Carrier Act of 1935, 49 Stat. 543, 49 U. S.C.A. § 301 et seq. The indictment charged that on or about October 15, 1935, and continuously thereafter to the return of the presentment, Frank Murphy, doing business as Frank Murphy Travel Bureau, in New York City; Mack Schultz, doing business as Main Travel Bureau, in New York City; Andrew Berns, doing business as Andy's Bus Depot, in Chicago; Walter Nisun, doing business as Midway Travel Bureau and NiSun Bus Lines and NiSun Lines, Ltd., in Chicago; Howard Steed, doing business as Steed Travel Bureau, in Omaha, Nebraska, also as Steed Travel Bureau and Reliable Travel Bureau, in Denver, Colorado; Oral V. McMenus, doing business as Mack's Travel Bureau, in Denver, Wm. Gottesman, doing business as Bill's Reliable Travel Service, in Denver; Edwin Oswald Weimer, doing business as Kane Travel Bureau, in Denver; Monty Cox, doing business as Interstate Employment Tourist Travel Bureau, in Salt Lake City, Utah; James Manasee, doing business as Nu-Way Cut-Rate Travel, in San Francisco, California; Carl Ernest Brown, doing business as Auto Travel Bureau, in Los Angeles, California; Austin Patton Muzingo, doing business as Pat's Travel Bureau, in Los Angeles; Rosemond Young and Oscar Turlington Marshall, each doing business as Coast to Coast Travel Bureau, in Los Angeles; Stanley Cruson, Colonel Perry, and Phillip Fisher Finch, doing business as DeLuxe Travel Bureau, in Phoenix, Arizona; James R. S. Lefebvre, doing business as U. S. Travel Service, in Phoenix; Harry W. Martin, doing business as Martin Travel Bureau, in El Paso, Texas; Guy Stedham and Doyle Coles, each doing business as Majestic Travel Bureau, in Fort Worth, Texas; Edd Roberts, doing business as A A Travel Bureau, in Fort Worth; V. C. Hale, doing business as All American Travel Bureau, in Fort Worth; John Elliott Frank, doing business as Frank The Travel Man, in Dallas, Texas; Pap Garland and Lee Garland, each doing business as Garland Bros. Travel Bureau, in Dallas; Jack Herring, doing business as Interstate Travel Bureau, in Oklahoma City, Oklahoma; Porter Allbee, doing business as Interstate Travel Bureau, in Tulsa, Oklahoma; and James W. Reddick, doing business as AAA Travel Exchange and Grand Travel Exchange, in Kansas City, Missouri, conspired, combined, confederated, and agreed, each with the other and with divers other persons whose names were unknown, to violate the Motor Carrier Act; that they: "so conspired * * * each with the other, and that they did, and each of them did, unlawfully * * * for compensation negotiate for, and did hold himself out by solicitation, advertisement, and otherwise, as one who sells, provides, furnishes procures, contracts, and arranges for transportation of passengers for the general public in interstate commerce by motor vehicle for compensation over and upon the public highways of the United States * * * and did, for compensation, negotiate for, provide, furnish, procure, contact, and arrange for such transportation of passengers for the general public in interstate commerce by motor vehicle for compensation * * * and was and is a broker and as such broker was and is subject to the Motor Carrier Act of 1935 * * *. And that they so conspired * * * each with the other, and that they did, and each of them did, unlawfully * * * enter into the execution of contracts, agreements or arrangements to sell, provide, procure, furnish, and arrange for such transportation; unlawfully * * * to employ for such transportation common carriers of passengers in interstate commerce by motor vehicle for compensation * * *, who or which said common carriers * * * were not the holder or holders * * * of an effective certificate of public convenience and necessity issued by the Interstate Commerce Commission of the United States, authorizing such common carriers to transport passengers for the general public in interstate commerce by motor vehicle for compensation, as aforesaid; such employment of said common carriers, as aforesaid, being unlawful and in violation of Section 211 of the Motor Carrier Act of 1935 [49 U.S.C.A. § 311] * * *." Murphy, Schultz, Weimer, Cruson, Finch, and

Lefebvre pleaded guilty; the case was dismissed as to Manasce at the close of the evidence submitted by the Government; directed verdicts of not guilty were returned as to Roberts, Frank Garland and Lee Garland; and Berns, Nisun, McMenus, Brown, Muzingo, Martin, Stedham, Herring, and Allbee were convicted. Stedham did not appeal. The others perfected separate appeals.

The Motor Carrier Act is attacked on the ground that it is unconstitutional for the reason that it fails to define a standard of conduct from which it may be determined when and under what circumstances its provisions are violated. The statute provides that it is the declared policy of Congress to regulate transportation by motor carriers engaged in interstate or foreign commerce in such manner as to recognize and preserve its inherent advantages; to foster sound economic conditions in such transportation; to promote adequate, economical, and efficient service by motor carriers; to prevent unjust discriminations, undue preferences or advantages, and unfair or destructive practices; to improve the relations between such carriers and other carriers; and to develop a system of highway transportation properly adapted to the needs of the commerce of the United States and of the national defense. § 202, 49 U.S.C.A. § 302. The term "common carrier by motor vehicle" is defined as any person who undertakes to transport passengers or property for the general public in interstate or foreign commerce by motor vehicle for compensation; the term "motor carrier" is defined to include both a common carrier and a contract carrier by motor vehicle; and the term "broker" is defined to mean any person, not included in the term "motor carrier" and not a bona fide employee or agent of any such carrier, who sells or offers for sale any transportation subject to the act, or negotiates for or holds himself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts, or arranges for such transportation. § 203, 49 U.S.C.A. § 303. The Interstate Commerce Commission is vested with power to administer the statute, that is, to regulate transportation of that kind. §§ 204, 205, 49 U.S.C.A. §§ 304, 305. It is provided that no common carrier subject to the act shall engage in interstate or foreign operation on a public highway, or within a reservation under the exclusive jurisdiction of the United States unless there is in force and effect an authorizing certificate of public convenience and necessity issued by the Commission, § 206, 49 U.S.C.A. § 306; and that no person shall engage in the business of a contract carrier by motor vehicle in such commerce on such a highway or within such a reservation unless there is in force and effect an authorizing permit likewise issued by the Commission. § 209, 49 U.S.C.A. § 309. But it is further provided that nothing contained therein shall be construed to include the casual, occasional, or reciprocal transportation of passengers or property in interstate or foreign commerce for compensation by a person not engaged in such transportation as a regular occupation or business, § 203, 49 U.S.C.A. § 303. It is also provided that no person shall for compensation sell or offer for sale transportation subject to the act or make any contract, agreement, or arrangement to provide, procure, furnish, or arrange for such transportation, or hold himself out by advertisement, solicitation, or otherwise as one who does such things unless he holds a broker's license issued by the Commission, § 211, 49 U.S.C.A. § 311.

Appellants did not transport passengers. They were unlicensed brokers engaged in the business of making arrangements for compensation for transportation of passengers by motor vehicle in interstate commerce. They, therefore, came within the purview of section 211 of the act. But it is argued that the statute fails to provide any standard or guide by which it could be determined whether the persons who transported such passengers were engaged in transportation of that kind as a regular occupation or business and were required to obtain certificates of public convenience and necessity, or were not engaged in such transportation as a regular occupation or business but merely carried such passengers as casual, occasional, or reciprocal transportation, and for that reason no certificate was required. The act brings within its provisions those regularly engaged in the occupation or business of transporting persons or property by motor vehicle in interstate or foreign commerce and excludes casual, occasional, or reciprocal transportation of that kind as a regular occupation or business, without undertaking to define textually either class or to fix a standard by which to determine in advance whether certain conduct is in one class or the other.

Reasonable definiteness and certainty is required in the enactment of statutes, but in the very nature of things rules of conduct oftentimes must be stated in general language and depend for their application upon diversified circumstances. It frequently is impossible to state in detail rules or formulae which will meet different conditions or varying qualities. A penal statute must be sufficiently explicit to enable a person of ordinary intelligence to understand its provisions but the employment of terms ordinarily used to express ideas is not fatal. The words "casual", "occasional", "reciprocal", "regular", "occupation", and "business" are in common use, and each has a well understood meaning; and in the absence of anything indicating otherwise it is to be presumed that Congress used them in their generally accepted meaning. It manifestly is possible through the exercise of ordinary intelligence to determine with reasonable exactness and certainty whether given facts and circumstances constitute engaging in the transportation of passengers or property as a regular occupation or business, or merely casual, occasional, or reciprocal transportation by one not engaged in it as a regular occupation or business. Accordingly, the statute is not so vague and indefinite that it offends the due process clause. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232; Miller v. Strahl, 239 U.S. 426, 36 S.Ct. 147, 60 L.Ed. 364; Omaechevarria v. Idaho, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763; United States v. Alford, 274 U.S. 264, 47 S.Ct. 597, 71 L.Ed. 1040; United States v. Wurzbach, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508; Sproles v. Binford, 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167; McElvogue v. United States, 8 Cir., 40 F.2d 889; United States v. Hill, 3 Cir., 90 F.2d 573.

Next to be considered are the contentions that there was a variance between the indictment and the proof in that the indictment charged a nationwide conspiracy to violate the statute by the employment of unlicensed carriers in interstate commerce while the proof showed, if anything, several small conspiracies; and that the evidence was insufficient to sustain the charge. These contentions are so interwoven that disposition may be made of them together. The substance of the indictment has been stated. There was evidence that appellants and others similarly engaged operated travel bureaus in cities. While there may have been others located elsewhere, reference is made in the record to two bureaus each in New York, Chicago, Denver, and Los Angeles, and one each in Salt Lake City, Phoenix, El Paso, Fort Worth, Dallas, Oklahoma City, Tulsa, and Kansas City. Signs were usually displayed, sometimes with such words as "share expense plan". One read: "This bureau has no connection with any bureau operated by Steed, but has working agreements with all other bureaus in Denver and from border to border and Coast to Coast"; another "Baggage Limited"; and a third "Drivers please loaf in the rear." And rates were frequently posted. Cards were printed usually containing such information as the name, street address, and telephone number. It was the custom for each bureau to send cards to others, and they were preserved as a directory and sometimes displayed. The usual method of business was that a person desiring transportation was charged a fee or compensation which usually ranged from fifty cents to two or three dollars depending upon the length of the trip, and he was told the time at which it was expected an automobile would depart. The automobile called at the bureau for passengers, and each passenger paid the driver his charge for the transportation. There was one exception. In some instances appellant Nisun collected the charge for the transportation and paid it to the driver. In the event the passenger was bound for a destination beyond that of the automobile, the bureau gave him a card called a transfer stating in substance that he was to be transferred to another automobile. Upon arriving at the destination of the automobile, the passenger presented the transfer to the bureau located there and that bureau placed him in another automobile for part or all of the remainder of the journey. To illustrate, if a passenger starting from New York to Los Angeles was placed in an automobile going no farther than Chicago, he was given a transfer addressed to a bureau in Chicago requesting that he be transferred to an automobile bound for Los Angeles or some intermediate point, and that process was repeated until he reached his destination. Each driver was paid his charge for transportation, but the intermediate bureaus did not make any charge for the transfers. Each of the bureaus operated by appellants issued one or more transfers to one or more other bureaus or accepted

one or more transfers issued by one or more of the others, but in no instance did a single bureau issue transfers to all others or accept transfers from all others. Some of the transfers bore a special notation stating in substance that the passenger desired a regular driver. Some of the appellants solicited business from others through correspondence, and some solicited it through personal visits and interviews. Appellant Nisun stated in a letter to Weimer that he had cars leaving every night for New York. There were two kinds of drivers. Those operating automobiles in such transportation as a business or occupation were called regulars; and those making occasional or infrequent trips and taking one or more passengers for the purpose of meeting the expense were called angels. There were a great many regulars. About fifty operated out of one of the bureaus in Chicago; about forty out of one in Denver; and about eighty per cent of those operating out of one in Los Angeles were regulars. Five regulars without licenses testified. One made several trips between Los Angeles and Chicago; he made six or seven out of the bureau of appellant Brown; he stopped at the Kane Travel Bureau in Denver; and he contacted the bureaus of appellants Berns and Nisun in Chicago. Another made four or five trips between Los Angeles and Chicago during one summer; he made two out of the bureau of appellant Brown; he contacted the bureaus of appellants Berns and Nisun in Chicago, that of Steed in Omaha and Denver, and that of Cox in Salt Lake City. A third transported passengers out of Fort Worth, Denver, and Kansas City. A fourth transported passengers out of Fort Worth, Oklahoma City, and Denver. The remaining one transported passengers from El Paso to Dallas; he made three trips out of the State of Texas; and he took passengers from the Martin Travel Bureau in El Paso. And passengers from different bureaus testified concerning other regular drivers. Emphasis is seemingly laid upon the insufficiency of the evidence to sustain the verdict against appellant Martin. There was a Martin Bureau in El Paso. Cards were in it advertising bureaus in different parts of the country. A man named Toby either operated it or was connected with it, but Martin was seen there on one occasion. He visited a bureau in Denver on two occasions, once in 1936 and once in 1937; he stated to an employee there that he owned the bureau in El Paso, and that he was doing a nice business; and on each occasion he and the employee agreed each to send the other all business possible. The bureau in Denver sent cards and passengers to him and received transfers from him. In like manner stress is laid upon the inadequacy of the evidence relating to appellant Allbee. He operated a bureau in Tulsa; he advertised in the papers; he sent cards to a bureau in Denver on two or three occasions; the cards bore the name of Herring on one side and that of Allbee on the other; he accepted one transfer and arranged for the transfer of the passenger; he sent transfers to the bureau in Denver; and a certain driver who drove for him and Herring made frequent trips to Denver. Appellant Allbee denied much of the testimony establishing these facts but that merely formed an issue of fact for the jury.

In respect to the question of variance there was evidence from which the inference could be reasonably drawn that the system existed throughout a large part of the United States; that all of appellants understood it and participated in it; and that they stood ready to further it by maintaining intercourse with all others through the issuance and acceptance of transfers. A variance is not to be treated as material unless there is a substantial departure of the proof from the charge of a character which could mislead the defendant at the trial. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. There was no departure of that kind here. The proof substantially conformed to the charge. The assertion of a material variance cannot be sanctioned.

Concerning the sufficiency of the evidence, the essence of the crime of conspiracy is two or more persons combining and confederating with the intent and purpose of committing a public offense by doing an unlawful act or doing a lawful act in an unlawful manner. The agreement need not be in any particular form. It is enough if the minds of the parties meet and unite in an understanding way with the single design to accomplish a common purpose, and the union of the minds may be proved by circumstantial evidence. The agreement may be inferred from statements, acts, and circumstances. It is frequently not susceptible of direct

proof. Parnell v. United States, 10 Cir., 64 F.2d 324; Telman v. United States, 10 Cir., 67 F.2d 716; Brayton v. United States, 10 Cir., 74 F.2d 389; Jaramillo v. United States, 10 Cir., 76 F.2d 700; Marx v. United States, 8 Cir., 86 F.2d 245; Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975; Robinson v. United States, 5 Cir., 94 F.2d 752. And it is not necessary that all of the parties be personally acquainted with each other. Neither is it requisite that one have direct contact with all others. It suffices if with knowledge that others have combined to violate the law, one knowingly co-operates in some affirmative manner to further the purpose of the conspiracy. Booth v. United States, 10 Cir., 57 F.2d 192; Wilder v. United States, 10 Cir., 100 F.2d 177, decided November 28, 1938; Allen v. United States, 7 Cir., 4 F.2d 688. The evidence adduced at the trial with the inferences and deductions reasonably to be drawn from it was sufficient to warrant the jury in finding that an agreement existed to violate the statute and that with knowledge of that fact each of the appellants affirmatively co-operated to further the unlawful design.

Complaint is made in respect to the instructions, also the refusal to give certain requested instructions. It is argued that the gist of the charge was an agreement to employ unlicensed carriers of passengers; that the court failed to so instruct; that instead the jury were erroneously instructed that the charge was a conspiracy to violate subsection (a) of Section 211 of the statute, 49 U.S.C.A. § 311(a), which provides that no person shall sell, offer for sale, provide, procure, furnish, or arrange for transportation, or hold himself by advertisement, solicitation, or otherwise as one who does such things unless he holds a broker's license authorizing him to engage in such transactions; and that the requested instructions correctly stated the elements of the offense laid in the indictment. The jury were instructed at the outset that the charge was a conspiracy to violate a law of the United States, and the conspiracy statute—Section 37 of the Criminal Code, 18 U.S.C.A. § 88—was quoted; they were then instructed that the object of the conspiracy was to violate one paragraph of the new statute in respect to the regulation of motor vehicles engaged in carrying passengers for hire between states, and subsection (a) of Section 211 was quoted as the provision; and they were further instructed: "The question in this case is, gentlemen, whether these defendants got together, any two or more of them, and had a common understanding that they would violate this law by doing what the government says they did, that is, by soliciting people for hire to go by motor transportation by arranging for their transportation from state to state, or advertising or holding themselves out as people properly authorized or able to procure such transportation. * * * If you believe beyond a reasonable doubt, gentlemen, that that was the practice, and that it was a practice and an understood thing between these dealers that they would get people from Chicago to the coast, or vice versa, or from Tulsa to Denver, or vice versa, it makes no difference where, by this method, and would recognize these introductions and forego a fee at every one of these places where a passenger had to transfer from one automobile to another, then you are justified in saying that the conspiracy existed. * * * You cannot convict these defendants for a casual or occasional or reciprocal transportation of passengers or property in interstate commerce for compensation by any person not engaged in transporting by motor vehicles as a regular occupation or business. The occasional act is specifically exempted by this particular act. * * * What is the evidence here, gentlemen? Briefly, it is something like this. The evidence of the government tends to prove that these different defendants had these several establishments in several different cities of the United States, extending from Chicago through Kansas City, Tulsa, Oklahoma City, Denver, and Salt Lake, two or three places in Texas, and out to California to Los Angeles; that by advertisements and solicitation they would attract passengers, people desiring to go by automobile from state to state, and that for a fee of $1.00, $1.75, or varying amounts, they would arrange for them to get transportation in some other fellow's automobile—they did not own these cars—and they would send them on to Kansas City, and give them a card of introduction to a man in Kansas City, for instance, who was in the same business, and he would arrange, upon presentation of this card, or letter of introduction, whatever you want to call it, it makes no difference—they would pass them on to another city until they finally reached their destination."

It is well settled that all parts of the instructions must be considered together, and that excerpts or particular parts cannot be separated and considered apart from the whole. Caldwell v. United States, 10 Cir., 36 F.2d 742; Tanchuck v. United States, 10 Cir., 93 F.2d 534. Considered in that manner it cannot be said that the jury failed to understand the nature of the conspiracy or the facts which must be established in order to warrant a conviction. Furthermore, the trial of the case extended throughout six days. Appellant Allbee testified briefly in his own behalf. Otherwise, appellants did not offer any evidence. An examination of the entire record indicates clearly that the verdict was right, and that the reference to section 211 of the statute cannot be regarded as substantial prejudice. A judgment should not be reversed for a harmless error. Berger v. United States, supra; Tanchuck v. United States, supra; Eierman v. United States, 10 Cir., 46 F.2d 46; United States v. Brown, 2 Cir., 79 F.2d 321; Stokes v. United States, 5 Cir., 93 F.2d 744; Stunz v. United States, 8 Cir., 27 F.2d 575; Dye v. United States, 4 Cir., 262 F. 6.

It may be conceded without deciding that each of the requested instructions was accurate in substance. But the instructions of the court fairly and fully covered the issues in the case, and a court is not required to give a requested instruction which is an accurate statement if the subject matter has been appropriately covered in the instructions given. Tingley v. United States, 10 Cir., 34 F.2d 1; Luke v. United States, 5 Cir., 84 F.2d 823; Brett v. United States, 9 Cir., 86 F.2d 305; Bowater v. Worley, 10 Cir., 57 F.2d 970; Detroit Fire & Marine Ins. Co. v. Oklahoma Terminal Elevator Co., 10 Cir., 64 F.2d 671; George v. Wiseman, 10 Cir., 98 F.2d 923.

The remaining contention which merits a word is that the conspiracy statute should not be used to subject one to a more severe penalty than that which may be imposed for the substantive offense.

Section 222 of the Motor Carrier Act, 49 U.S.C.A. § 322, provides that the penalty for the first violation of its terms shall be a fine of not more than $100, and that the penalty for each subsequent violation shall be a fine not to exceed $500. Some of appellants were sentenced to the penitentiary and to pay a fine of $500, and others were given jail sentences. But they were found guilty of the crime of conspiracy. The crime is distinct from the offense which the parties intend to accomplish as the result of the conspiracy; and it is completed when the agreement has been formed, and one or more overt acts have been committed in furtherance of such unlawful design. Callan v. Wilson, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223; Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419; Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L.Ed. 269; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; United States v. Rabinowich, 238 U.S. 78, 35 S. Ct. 682, 59 L.Ed. 1211; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; Di Bonaventura v. United States, 4 Cir., 15 F.2d 494; Marcante v. United States, 10 Cir., 49 F.2d 156; Booth v. United States, supra; Marino v. United States, supra; Maryland Casualty Co. v. Hosmer, 1 Cir., 93 F.2d 365.

Section 37 of the Criminal Code, supra, fixes the penalty for the crime of conspiracy, and these sentences were within its limits. The fixing of penalties for criminal offenses is a legislative function; and a sentence within the limits fixed in the statute which has been violated will not ordinarily be disturbed on appeal as being excessive, or cruel, or inhuman. Bailey v. United States, 10 Cir., 74 F.2d 451; Martin v. United States, 10 Cir., 99 F.2d 236.

The remaining contentions are so lacking in merit that they need not be discussed.

The judgments are severally affirmed.