71 So.2d 267

**BANKERS & SHIPPERS INS. CO.
OF NEW YORK**

v.

**BLACKWELL.**

2 Div. 298.

Supreme Court of Alabama.

March 11, 1954.

F. W. Davies, Davies & Williams, Birmingham, for appellant.

Edgar P. Russell, Jr., Wilkinson & Wilkinson, Selma, for appellee.

466

counts 3 and 4. They are for present purposes the same in legal effect. The suit was on transportation (called cargo inland) insurance, alleged to cover certain lawnmowers which plaintiff had contracted with the owner to transport by truck from Alabama to Texas and other states. The owner was not a party to the suit, but it was by the truck owner for loss or damage to the lawnmowers in transit. The loss was within the coverage of the policy as amended. The defense in part in both trials was that plaintiff was engaged in transporting said lawnmowers in interstate commerce as a contract carrier and had not secured a permit or certificate of convenience and necessity from the Interstate Commerce Commission to haul them; that said hauling was illegal and in violation of the laws of the United States, and that his contract to haul them was illegal and unenforceable and null and void, and that it was a crime to do so under said laws.

We held on former appeal that such was a good defense to the action and reversed a judgment for plaintiff.

On the second trial, likewise resulting in a verdict and judgment for plaintiff, the same pleas were interposed. But plaintiff filed two special replications besides the general issue. The pleas having alleged that plaintiff was engaged in hauling lawnmowers, replication No. 2 is that plaintiff's regular occupation or business was that of a farmer and cattleman and he was not engaged in the regular business of transporting goods by motor vehicle for compensation, and his hauling at the time of the loss was not illegal under the laws of the United States.

The third replication was that plaintiff was but a casual or occasional hauler of property by motor vehicle in interstate commerce and his regular business was not that of a contract carrier engaged in transportation by motor vehicle as a regular occupation or business and was not hauling said lawnmowers in violation of the laws of the United States.

**PER CURIAM.**

This is the second appeal in this case 255 Ala. 360, 51 So.2d 498. On this appeal, as on the former, the trial was had on

After demurrer to those replications was overruled, issue was joined on them and on the pleas above referred to and a ver-

dict was rendered for plaintiff—hence this second appeal.

We will consider the contentions made by appellant in the order in which they are discussed in brief.

The first contention is that on those issues the defendant was entitled to the affirmative charge as requested and which was refused by the court. It is not contended by appellant that plaintiff was a common carrier as defined by the federal statute. 49 U.S.C.A. § 303(a) (14), but that he was a contract carrier by motor vehicle and, therefore, subject to the federal statute as to the necessity for a permit or certificate from the Interstate Commerce Commission. 49 U.S.C.A. §§ 304 and 306. A contract carrier is defined by 49 U.S.C.A. § 303(a) (15) as "any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation." The definition of a common carrier in § 303(a) (14), supra, is "any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company", etc., not here necessary to quote further. Said statute also provided in section 303(b) (9) that "the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business," shall not be construed as included in the Act.

So that the question now considered is whether the activities of plaintiff at the time of his hauling the lawnmowers are such as are not included in the Act. Particularly, it is whether his acts of hauling in interstate commerce the lawnmowers involved and his other acts of hauling in interstate commerce were "casual or occasional" (they were not "reciprocal"), and when he was "not engaged in transportation by motor vehicle as a regular occupation or business".

The evidence is summarized by the respective parties. Appellant's summary is as follows:

"He (appellee) further testified that on the date of the accident involved in this case that he had two trucks which he used in hauling; that during 1948 he was engaged in hauling cotton for William A. McClinton, and that he did haul for McClinton if his trucks were not busy otherwise; that he hauled that fall up until January, 1949; that he hauled during October, November and December, and that he continued to haul for McClinton under this arrangement for a period of about one year in 1948; and that he hauled cotton after the wreck involved in this case; that he not only hauled cotton, but that he hauled fertilizer, seed, and oats for his neighbors and his brother; that he began to haul lawnmowers in November, 1948, and that he made an agreement with the Southland Mower Company to haul lawnmowers; that he told Mr. Lyemance that he would haul them for him, and that he had other trucks hauling, too, and that he hauled up until January, 1949. He further testified that when he hauled cotton he hauled it from different places, from compresses; that he hauled to Tallassee, Russellville, Montgomery; and that he made a trip to Columbus, Georgia, and different mills around; and that he did haul for McClinton if his trucks were not busy hauling for himself; and that he did have an agreement to haul; and that he had an agreement with McClinton that McClinton would take ten per cent of the money from the load and that he got ninety per cent."

Appellee's summary, not including the details by different witnesses, is as follows:

"The evidence was without dispute that during the fall of 1948, when the

accident occurred, appellee operated a cattle farm of some 1900 acres on which was pastured between six and seven hundred steers; that he planted some four hundred acres in oats; that he bought and sold cows during the entire year; that he used the two trucks in buying and selling cattle throughout the State, in hauling his fertilizer, farm products, equipment and in gathering his crops; that appellee's brother likewise operated a cattle farm of approximately the same acreage, which was adjacent to that of the appellee, and appellee hauled his brother's cattle for him, without pay. * * *

"The evidence further showed that appellee other than his farming operation hauled at most during the year 1948 twelve loads of lawnmowers and some ten to twenty loads of cotton, that these lawnmowers hauled by him in interstate commerce were hauled for the Southland Mower Company when his trucks were not busy hauling his own farm produce; that he never made out any bills of lading for such hauling; that he did not advertise that he was hauling in any way; he never solicited any business; he did not advertise in the newspapers or put up any notices anywhere that he was engaged in hauling; that the only hauling which he did for others, other than the lawnmowers, was at the solicitation of his friends, and that was just hauling farm products. That the lawnmowers which he hauled was done at the request of Mr. Lyemance, and he did not solicit such hauling. * * *

"The evidence showed that the appellee in addition to hauling the twelve loads of lawnmowers, hauled for compensation between ten and twenty loads of cotton during the year 1948, and this transportation was done when the appellee was not using his trucks in his farming operations. Only one or two loads of such cotton were hauled out of the State."

The words of the federal statute "casual and occasional" have a meaning opposite to the words "regular occupation", and all have a well understood meaning, assumed to have been intended in using them in the statute. That is obvious and has been so declared in numerous cases. Martin v. United States, 10 Cir., 100 F.2d 490; I.C.C. v. Dunn, 5 Cir., 166 F.2d 116; Say v. Prior Oil Co., 157 Pa.Super. 629, 43 A.2d 417. We quote their meaning as given in Webster's New International Dictionary (2d Ed.); as follows: *"Casual,* occasional; coming without regularity; incidental". *"Occasional,* occurring at irregular intervals; infrequent". *"Regular,* steady or uniform in course, practice or occurrence".

The result is a factual inference from the facts established by the evidence. That was properly submitted to the jury and their verdict is reasonable and should be approved.

A policy of insurance had been issued to appellee by appellant extending for the period from August 25, 1948 to August 25, 1949, and covering the risk of damage in the haulage by appellee of his own goods and merchandise. There was ample evidence to support the finding by the jury that on November 1, 1948 Matthias and Matthias told appellee, at his request, that he was covered by an extension of the policy then held so as to include lawnmowers to be hauled by appellee for hire, which would continue until he heard from them. This statement was never reduced to writing. There was no error in submitting that question to the jury, and their verdict as to it should not be disturbed.

The next contention made by appellant is that set out in plea No. 26, which averred in substance that it was provided in said policy of insurance sued on that it did "not cover to the extent of any other insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly, covering the same property". It then averred that at the time of the loss appellee did have other

insurance entirely covering loss of the same property. That said policy was issued by the California Insurance Company.

The evidence was that the accident occurred about 8:30 a. m. on December 3, 1948 to defendant's truck in Louisiana, on a haul being made by defendant of lawnmowers belonging to Southland Mower Company, damaging them in an agreed amount for which plaintiff claimed and recovered a verdict and judgment.

The policy sued on, by its terms, as we have said, extended from August 25, 1948 to August 25, 1949, and was amended about November 1, 1948 by verbal agreement as plaintiff contends.

A policy was issued to appellee by California Insurance Company, dated December 2, 1948, and purported to extend from that date; but was executed several days after the accident. The testimony of appellee was that about 12 o'clock of the same day, and after the wreck had occurred and after he had heard of it, he first mentioned to an agent of the California Insurance Company (Mr. Hooper) that he wanted to take out some cargo (inland) insurance because the agent of appellant, Mr. Matthias, had told him his company was cancelling its insurance. Appellant did not in express terms cancel the policy which it had issued to appellee until December 8, 1948, with a return of the unearned premium of $192. There are some tendencies of the evidence to show that the verbal coverage by the California Insurance Company may have extended from December 2, 1948.

So that it was a question of fact whether the verbal agreement with the agent of the California Insurance Company extended from December 2d so as to include December 3rd, when the wreck occurred and, therefore, that appellant's coverage was thereby limited under the terms of the policy. That question we should not take from the jury.

█ But it is contended by appellant that parol evidence is not admissible for the purpose of contradicting the terms of a written contract by showing that it was not operative on December 3rd, when the wreck occurred, notwithstanding its terms so indicate. There is no doubt but that the policy was not delivered until after December 3rd, though it bears date of December 2d. The question is, what was the contract status at the very time of the accident? If there was a valid verbal agreement of insurance by the California Insurance Company covering the risk in question, it would be sufficient to limit appellant's policy to that extent. But if there was no such verbal agreement, a policy dated so as to include the damage in question, but executed after the loss, does not serve to effect coverage then on it. It is said in 45 C.J.S. Insurance, § 573, page 365, note 21: "It is no defense to a recovery on the first policy that after a loss a further policy was issued and antedated, even though insured forced a compromise thereon". Taylor v. State Ins. Co., 107 Iowa 275, 77 N.W. 1032; Id., 98 Iowa 521, 67 N.W. 577; Murray v. Niagara Fire Ins. Co., Mo.App., 265 S.W. 102. See, Home Insurance Co. v. Shriner, 235 Ala. 65, 177 So. 897.

██ It is immaterial whether or not the California Insurance Company bound itself for the loss by agreement made after the loss. The liability of appellant in respect to the loss on that account depended upon the status existing at the time of the loss, as alleged in the plea. At that time the policy of California Insurance Company was not in existence. Whether it had a verbal contract of insurance was, as we have said, a question for the jury. The policy did not become effective until its delivery and acceptance. This may always be shown by parol evidence, regardless of its effect on antecedent transactions by its terms. A written contract, even between the parties to it, may be shown by parol to have been executed and delivered on a different day from that expressed in it. 9 Alabama Digest, Evidence, ⊕414. The case of Ex parte St. Paul Fire & Marine Ins. Co., 236 Ala. 543, 184 So. 267, cited by appellant, in no respect conflicts with that principle.

It is next insisted that Matthias and Matthias, who are alleged to have made the verbal coverage on which appellee bases his claim, did not have authority to do so. It is conceded that Johnson, Overton and Company of Birmingham had full authority in that respect. The evidence for appellee tended to show that on or about November 1, 1948, Matthias told appellee he was covered in respect to hauling lawnmowers until he heard from him, and that it was after the loss on December 3rd that he told Matthias he would get other coverage immediately. The firm of Matthias and Matthias was composed of Raymond C. and Mary E. Matthias. Appellant had furnished forms to Matthias and Matthias to be filled out when they issued policies, but they were for fire, extended coverage, and automobile with extended coverage: but for cargo insurance the forms were not so furnished nor filled out in their office, but were filled out by Johnson, Overton and Company when they approved the applications and sent the policies to Matthias and Matthias to be countersigned by them and then delivered. Matthias and Matthias collected the premium for the policy which was issued to appellee, but which then did not cover the lawnmowers, but they countersigned said policy and delivered it to appellee. It appears they had never issued but one such policy. Appellee did not know of their limited authority as to cargo insurance, if that was the meaning of their agency contract. There was a written agency contract between them and appellant applicable to Selma and vicinity. No question is here raised as to the territorial limits of the agency powers. The agency agreement contained the following provisions:

"Pursuant to request that the underwriting facilities of the company be made available to the undersigned, as agent, the company hereby grants authority to receive and accept proposals for such contracts of insurance covering risks on properties located in Selma, Alabama, and vicinity as the company has authority lawfully to make; subject, however, to restrictions placed upon such agent by the laws of the state or states in which such agent is authorized to write insurance business and to the terms and conditions hereinafter set out.

"It Is Hereby Agreed between the company and agent as follows:

"(1) Agent has full power and authority to receive and accept proposals for insurance covering such classes of risks as the company may, from time to time, authorize to be insured; to collect, receive and receipt for premiums on insurance tendered by the agent to and accepted by the company and to retain out of premiums so collected, as full compensation on business so placed with the company, commissions at the following rates".

Two applicable principles are well settled by our cases. One is that when a local agent's authority is limited to soliciting insurance, delivering policies and collecting premiums he has no power to change stipulations in the contract of insurance and cannot waive the breach of conditions in the policy, and cannot make a binding contract of insurance or to insure. Liberty National Life Ins. Co. v. Staggs, 242 Ala. 363, 6 So.2d 432.

The other principle is that an agent who is authorized to solicit and receive applications for fire insurance, and, at his discretion, to countersign and issue policies of insurance intrusted to him by the company for that purpose, must be regarded *quoad hoc* as the general agent of the company. Yorkshire Ins. Co. v. Gazis, 219 Ala. 96, 121 So. 84. We have many cases so declaring.

In respect to the former class, Matthias and Matthias had more authority than is mentioned above. It was their signature countersigning the policy as well as its delivery by them that made the contract. In respect to the latter class, however, they were not furnished blank forms with authority to accept a risk and countersign and issue a policy of cargo (inland) insurance, such as this, in their discretion.

The company had not made it a practice to issue such policies through that agency. The agency contract granted to Matthias and Matthias authority "to receive and accept proposals for such contracts of insurance covering risks on properties located in Selma, Alabama, and vicinity as the company has authority lawfully to make"; but it further provides that the "agent has full power and authority to receive and accept proposals for insurance covering such classes of risks as the company may, from time to time, authorize to be insured". It had not previously authorized Matthias and Matthias to accept risks of that class.

The policy which had been issued by appellant to appellee, dated August 25, 1948, as we have said, covered lawful goods and merchandise consisting principally of cotton and farm products, the property of appellee, or sold by him and in the course of delivery, and which was amended in November 1948 by parol agreement with Matthias and Matthias to cover lawnmowers hauled by appellee for hire and belonging to others. The agents in Birmingham had notice that appellee was hauling lawnmowers for another for hire and supposedly was acting under the verbal agreement with Matthias and Matthias, and made no objection to appellee in respect thereto. The only question here considered is whether Matthias and Matthias had authority to include lawnmowers hauled for hire or whether the company ratified the verbal agreement made by Matthias to do so.

The policy as originally written would have covered lawnmowers belonging to appellee if he had been hauling them for delivery to complete a sale. The addition to cover the hauling of them for hire when they belonged to another seems to us to add but little more risk than if he were hauling them for himself. It was substantially the same class of risk within the meaning of the agency clause. Appellant does not claim that it had no authority of law to take the risk. The Southland Mower Company was located at Selma. Matthias and Matthias countersigned the very policy in question, with due authority specially conferred. Appellee had no cause to suspect that his authority was limited to the ownership by appellee of the goods and merchandise to be hauled in respect to that form of policy. The agency contract, the nature of the business and of the goods to be hauled, its ownership, and the attitude of the agents in Birmingham, are sufficient to justify an inference by the jury that, at least for the purposes here in hand, Matthias and Matthias were general agents, without limiting their authority to insure goods owned by appellee, and there was no error in submitting that question to the jury.

There are several other contentions made by appellant in brief but those which are principally insisted upon were fully covered by us in the opinion on former appeal, and nothing has been added in the brief in respect to those questions which cast any doubt upon the correctness of the principles there declared and applied. The other contentions made in brief are such as we feel do not need separate discussion in this opinion. They have been considered and cannot be sustained for obvious reasons.

The judgment of the lower court should be affirmed.

The foregoing opinion was prepared by FOSTER, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, GOODWYN and MERRILL, JJ., concur.