## DEACON v. UNITED STATES.

### No. 3601.

Circuit Court of Appeals, First Circuit.

Dec. 22, 1941.

354

William H. Lewis, Jr., of Boston, Mass., for appellant.

Jackson J. Holtz, Asst. U. S. Atty., of Boston, Mass. (Edmund J. Brandon, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, JJ.

WOODBURY, Circuit Judge.

This is an appeal from a judgment of the District Court sentencing the defendant to a term of imprisonment after he had been found guilty by a jury on two counts of an indictment. The first of these,—it was also the first count in the indictment, —charged the defendant under 18 U.S.C. A. § 88 with conspiring with others to commit the crime of transporting lottery tickets in interstate commerce. The second count upon which he was found guilty, the sixty-third in the indictment, charged him under 18 U.S.C.A. § 387, with the substantive offense mentioned above. Seventy-two other persons were named in the indictment but none of them stood trial, some having pleaded guilty and the indictment having been nol prossed as to others.

The defendant is a member of the medical profession. In 1934 he became a director and the managing head or superintendent of the Rogers Park Hospital in Chicago, Illinois. It appears that this institution was more or less chronically in need of funds and that dances and similar functions given for its benefit had not proved particularly successful. Early in February, 1937, the name of the hospital was changed to the Will Rogers Memorial Hospital and it was chartered by the state under that name as a corporation "not for profit".

One David M. Rice, a witness called by the government and a co-defendant who pleaded guilty, testified to the effect that in August, 1937, he had a conversation with Doctor Deacon in the latter's office in the hospital in which, after some remarks concerning the Irish Sweepstakes, the doctor said "that he thought he could (do) something like that, that if he had that much funds coming in, or something, it would be good." The witness then went on to describe the conversation as follows: "Anyway, one thing led to another. I said I knew someone that ran sweepstakes and baseball and treasury pools, and so forth, and if he was interested, why, maybe I could do something for him; so he said he was and I said, well, I would talk to him."

The above witness' wife Elizabeth, another co-defendant (she was the superintendent of nurses at the hospital), testified that later on in August, at her husband's suggestion, she arranged a meeting between the defendant and a person known to her and her husband as Abraham F. Zimmerman,[1] but whom she introduced to the defendant under the alias of Joseph White.

This individual, by his own admission on the stand, was at the time when he met the defendant, and for some twenty years before that time had been, engaged in the business of operating treasury, baseball and racehorse pools through an organization called the Gold Bond Company. The organization which he had built up over the years was large and extended throughout the northeastern states. It included salesmen in Massachusetts. These facts were known to the Rices but it does not

---

[1] He was also a co-defendant who pleaded guilty.

definitely appear that they were also known to the defendant, although in the light of his reported conversation with David Rice it might be assumed that he would have surmised something of the sort. However, there is evidence that at this meeting, or at least at some other one held soon thereafter, Zimmerman told the defendant that he was then operating a pool and that he was "adept at the business of running pools or fund raising projects", and that his organization included agents in various states. Conversations at this meeting and at others which followed resulted on September 23, 1937, in the execution of a five year contract between Zimmerman personally and the hospital corporation.

This contract provided that Zimmerman was "to promote charitable contests in the name of the Will Rogers Memorial Hospital for the purpose of raising money," such "contests" "to be run in a monthly series," and that he was to pay the hospital monthly sums ranging between $500 and $1,500 during the life of the contract. It was stipulated that "The above sums are to be made payable on the first of each month to the Will Rogers Memorial Hospital."

In return for these benefits the hospital agreed that it would not "engage in any other venture of a charitable nature" without the written consent of Zimmerman; that it would affix a sign bearing the name Will Rogers Memorial Hospital "in a conspicuous place at or near the entrance" and that it would display upon its premises "no other sign bearing any other name"; that it would provide on its premises "a space * * * to handle all communications and inquiries"; and that it would account to Zimmerman for "all monies received by * * * (it) from the sale of contest tickets." The contract contained a clause to the effect that both parties to it were "to cooperate in every respect to the end that the contest or contests will be successful." Zimmerman used his alias of Joseph White in signing this contract, and the defendant signed it as president of the hospital corporation. At the time of execution it was orally agreed that before publication proofs of all tickets and advertising matter would be submitted to the defendant for approval.

There was evidence that soon thereafter, with the defendant's knowledge and consent, photographs for advertising purposes were taken in the hospital and that later on printer's proofs of tickets and advertising matter were submitted to and approved by the defendant. Early in January, 1938, Will Rogers Memorial Hospital Charity Fund tickets and advertising matter were shipped in interstate commerce by members of Zimmerman's organization. Interstate motor carriers were the principal instrumentalities employed. Very soon after these shipments were made inquiries regarding the authenticity of the tickets, some of which came from states other than Illinois, began to pour into the hospital. There is evidence that the defendant knew of these inquiries and of the places from which they originated, and there is also evidence that he assisted in formulating the replies thereto.

The defendant, denying a large part of the evidence summarized above, takes the position that he was but the innocent dupe of Zimmerman. When he took the stand in his own defense, however, he admitted that he learned Zimmerman's real name in December, 1937, and that by mid-January, 1938, he was aware that the latter was operating a lottery.

We turn now to the question whether the evidence briefly summarized above is sufficient to support the defendant's conviction under the first or conspiracy count of the indictment.

There can be no doubt that in 1937, and for at least the first part of 1938, Zimmerman and his associates were banded together in the enterprise of shipping lottery tickets in interstate commerce in violation of 18 U.S.C.A. § 387, and there is ample evidence that on various occasions during the latter part of 1937 the defendant had read and approved proofs of the Will Rogers Memorial Hospital Charity Fund tickets and advertisements which Zimmerman was preparing to distribute, and later distributed, to his salesmen in other states. There is also ample evidence that during the first half of January, 1938, after distribution had taken place, the defendant assisted in answering inquiries concerning the authenticity of the tickets. This evidence is sufficient to warrant the conclusion that the defendant participated in the illegal enterprise of Zimmerman and his associates, but the defendant contends that it is not enough to warrant his conviction under the Federal Statutes for conspiring with them because there is no legally sufficient evidence to show that at the time when his acts of participation

took place he knew that Zimmerman's activities were in violation of 18 U.S.C.A. § 387.

The defendant asserts that until mid-January, 1938, he supposed that the contests referred to in the contract,—although he left the determination of their exact nature to Zimmerman,—were to be athletic or literary ones, that is, dances, rodeos, wrestling matches, prize fights or essay contests, and that he did not find out that in reality Zimmerman proposed to award prizes as the result of lot or chance until after he had participated with Zimmerman as above described. The government, on the other hand, contends that the evidence is sufficient to indicate beyond a reasonable doubt that the defendant knew from the outset that Zimmerman first proposed to operate and later actually operated a lottery throughout the northeastern part of the United States.

The words of the contract "to promote charitable contests in the name of the Will Rogers Memorial Hospital for the purpose of raising money," do not unmistakably show that a lottery was contemplated. Neither does the wording of either the tickets or advertisements contain anything to indicate that the prizes therein mentioned were to be awarded on the basis of lot or chance. However, neither does anything therein give any indication as to how prizes were to be awarded, and nothing is anywhere said about any sort of dance, exhibition, athletic contest or literary competition.

In view of the vaguely guarded language of the contract and of the large sums of money payable thereunder to the hospital; in view of the reported conversation between the witness David Rice and the defendant and the obvious advantage of the hospital's name to one who wished to operate a lottery; in view of the wording of the advertisements and tickets which are before us as exhibits and their obvious adaptability for use in a lottery, (their form and design would hardly serve any other purpose); and in view of the defendant's obvious indifference as to what if any actual contests, social functions or exhibitions were ever to be held, we are of the opinion that a jury of reasonable men might find that beyond a reasonable doubt the defendant actually had full knowledge from the beginning that those with whom he had agreed and whose ends he advanced were conducting a lottery not only in Illinois but in other states as well.

If he knew the nature of Zimmerman's business and knew of its interstate character, he must also have known that lottery tickets would be shipped in interstate commerce by someone in Zimmerman's organization. This is sufficient (Goodman v. United States, 3 Cir., 97 F.2d 197, 199 and cases cited), and the situation is not altered by the fact that he did not know and never met the employee of Zimmerman who actually made the shipments. Martin v. United States, 10 Cir., 100 F.2d 490. That the defendant did not personally stand to profit directly from Zimmerman's scheme is also beside the point. The statute does not make personal profit the test of guilt.

There was ample evidence that overt acts were committed in the District of Massachusetts by members of Zimmerman's organization. Under the statute this, in view of the evidence that the defendant was in the conspiracy, is enough to charge the defendant with the commission of such acts in that state and to render him triable there. Palmero v. United States, 1 Cir., 112 F.2d 922, and cases cited.

It follows that the District Court did not err in refusing to direct a verdict for the defendant on the conspiracy count.

Since identical terms of imprisonment were imposed under both counts and the sentences were to run concurrently, we need not consider the defendant's contentions with respect to the substantive count. Jarvis v. United States, 1 Cir., 90 F.2d 243, 246, and cases cited; United States v. McGuire, 2 Cir., 64 F.2d 485, 492, and cases cited.

We turn now to the defendant's contentions that the District Court committed reversible error during the course of the trial.

He says in his brief that the failure of the court below "to charge the jury as to what a lottery is" was a "fundamental error fatal to sustaining the conviction" and that "This error goes to the core of the entire case." We cannot agree.

There was no issue at the trial on the question of what a lottery is. There was no dispute concerning its definition nor was there any doubt that Zimmerman's scheme included a prize or prizes to be

distributed by lot or chance to those and to those only who had given a consideration for the chance to participate. Zimmerman himself admitted as much and the defendant did not contend otherwise. The issue for the jury was not whether Zimmerman was conducting a lottery but whether the defendant conspired with him to do so. Under these circumstances we fail to see how the court below was called upon to fully explain to the jurors, at the risk of confusing them, the exact nature of a lottery.

The defendant next contends that the court below adopted an erroneous view of the law in charging the jury as follows:

"If the jury find that Dr. Deacon went into this enterprise believing that it was a legal one, in accordance with the contract, and did not know that any lottery enterprise was to be engaged in, and was kept in ignorance by White and others as to what they were doing, until he was informed by the Chief of Police that a lottery was going on, you should find the defendant not guilty as charged,[2] *if you find that at the time that he first became acquainted with or had knowledge that the illegal acts were being done that he repudiated them instantly.*"

"The Government argued two positions. First, that this man went into this thing with his eyes wide open, and knew from the start that they were to run a lottery, and they argue from the other position that he may have been duped, or didn't learn of the illegal lottery until later after he had been in it for some time. Now I say to you, if you find that this man from the start didn't have knowledge that it was an illegal enterprise, but later learned that a lottery was being conducted, then, in order to avoid the consequences of becoming a member of that conspiracy by his adoption of it, *he must immediately, upon learning of its illegality, disassociate himself from it. So that if he was duped, and found out later that it was illegal, and promptly got out of it, then I would say to you he would not be guilty.* If, however, having learned of it, and if for any reason—it makes no difference what the reason may have been—he adopted the activities of the other men to the conspiracy, no matter how innocent his actions may have been, and then he went

along with it, he was in mutual agreement with the others, regardless of whether he committed an overt act himself, then he would be guilty. As I have explained it to you today, *when one seeks to disassociate himself from an illegal enterprise his disassociation must be full, decisive and complete,* and I gave you an example used by the courts that it is too late for a conspirator in a crime of dynamiting a building to withdraw after the fuse has been lit. It requires much more than that. He must stamp out the fuse."

Again, the trial judge told the jury:

"If, however, you find that at the time he learned of it he did all things humanly possible, all things that a reasonable man would be supposed to do who found his name associated with an illegal enterprise, then if he did that he could not be found guilty."

The defendant contends that these excerpts from the charge, and others of similar import which we need not quote, constitute erroneous statements of the law. He argues that since mere knowledge that others have banded themselves together to break the law does not, without actual participation with them, make one guilty of conspiracy (United States v. Falcone, 2 Cir., 109 F.2d 579, affirmed 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128), and since actual participation to be guilty participation must be done with knowledge of the conspiracy. (United States v. Falcone, supra,) one who, after innocent participation, discovers the real nature of his acts cannot be guilty of conspiracy unless after his knowledge has become complete, he does some other or further participatory act. That is to say, he contends that one who innocently participates with others who are engaged in a conspiracy may, after he has discovered what he has actually done, stand passively by and remain guiltless.

No cases squarely in point have been cited to us by counsel or have come to our attention. We must, therefore, approach the problem by considering general principles and analogous cases.

■ At common law the crime of conspiracy was complete when one had agreed with others either to do an unlawful act or to do a lawful act in an unlawful way. The Federal statute, 18 U.S.C.A. § 88, however, added another element to the

---

[2] Italics supplied.

crime. For conviction under this statute it must appear, in addition to proof of an agreement of the sort punishable under the common law, that some member of the conspiracy did an overt act, some act in furtherance of the venture. "The gist of the offense of conspiracy as defined by § 37 of the criminal code, 18 U.S.C.A. § 88, is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy." United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128.

It has been held that under this statute a conspirator may withdraw from a conspiracy by doing something definite and decisive to disassociate himself therefrom and thus escape the consequences of the acts of his fellows thereafter. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Stephens v. United States, 9 Cir., 41 F.2d 440, 448; Mansfield v. United States, 8 Cir., 76 F.2d 224, 229. Evidently this is the principle upon which the court below relied in charging the jury, but the cases which establish it are not in point. In all of them the defendant knew of the existence of the conspiracy before he did the act or acts which made him a participant therein, and thus he was an actual conspirator at the time of his attempted withdrawal, but, in the case at bar, assuming now that the jury accepted as true. the government's second theory of guilt referred to by the court in the second excerpt from the charge quoted above, the issue is whether or not the defendant ever was a conspirator. He takes the position that under the foregoing assumption as to the facts he was not, and that it would be utterly illogical to hold that he became one by reason of his failure to withdraw from a conspiracy he was never in.

We do not feel called upon to consider this contention as an abstract proposition because of the undisputed evidence of the defendant's conduct after he learned the true facts in mid-January, 1938. It appears that on January 31, 1938, the hospital accepted a payment from Zimmerman under the contract of September 23, 1937, and it appears that during the latter half of January and the first half of February, 1938, inquiries concerning the tickets continued to be answered from an office in the hospital located only a few feet from the defendant's. From the defendant's own testimony it appears that he never reproached either Zimmerman or Mrs. Rice for having involved the hospital in the lottery, and it does not appear that he ever repudiated the contract or took any steps to prevent the hospital from continuing to accept benefits under it. Also, despite the fact that he had (innocently, as he claimed) allowed the use of the hospital's name as the main advertising feature of the venture, and despite the fact that he had provided facilities at the hospital for handling inquiries relating to the venture, Deacon, after learning the criminal nature of the scheme, took no steps to cause the discontinuance of the assistance he had provided, but on the contrary permitted such assistance to continue. Thus it is apparent that the defendant permitted the hospital to continue to participate in the illegal venture in which he had embroiled it even after he became aware of the true nature of that venture. Whatever may be the rule which applies to the situation presented when one discovers that he had at some time in the past innocently participated in a conspiracy the object of which had been attained or abandoned, we are of the opinion that the charge, as applied to the facts presented in the case at bar, was correct.

As stated by the court in Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961, 967, "It is also a part of the law of joint crimes that, when a party joins an existing group already so engaged, he assumes responsibility for all that has been done theretofore." Taking the version of the evidence to the effect that Deacon was originally ignorant of the criminal nature of the conspiracy, at what point of time can it be said that he had joined the existing group already engaged in operating the lottery? This would not be immediately upon Deacon's receipt of knowledge, for to be held as a conspirator he must have willed to associate himself with the criminal enterprise. But from his failure to disavow his connection with the conspirators within a reasonable time and from his permitting the facilities which he had theretofore furnished them to be continued in the promotion of the criminal enterprise, the inference is warranted that shortly after learning the true situation, he did in fact elect to associate himself with the criminal enterprise. Having thus

joined the existing conspiracy, "he assumes responsibility for all that has been done theretofore."

We cannot endorse the rule contended for by the defendant as a general proposition, for the reason that in the instant case it would require a finding of not guilty after Deacon learned the facts merely because of his passivity thereafter, wholly ignoring the vital fact that after receiving knowledge he continued to reap indirectly the fruits of the wrong which his conduct, although innocent, had advanced; and the further fact that he continued to permit the use of the facilities he had theretofore provided. In our opinion Deacon was certainly under a duty, after learning the facts, to take some definite, decisive and positive step of withdrawal from the venture. As limited by the facts presented we do not believe that the rule given to the jury by the court below either sets too high a standard for behavior or imposes undue hardship.

The defendant next contends that "The court erred in instructing the jury that 18 U.S.C.A. § 550, the aiding and abetting statute, applied to the case." He says (1) that he was not indicted as an aider or abettor and (2) that "there was no evidence that he participated, 'counseled, commanded, induced or produced' a shipment of any kind." This contention is also lacking in merit. The first count of the indictment specifically charges the defendant with aiding and abetting the commission of the crime of conspiracy and thus with being a principal, and as already appears in this opinion, the defendant's acts of reading and approving the printer's proofs of tickets and advertisements and his assistance in answering inquiries were acts of participation done at a time when the jury might find that he had knowledge of the illegality of Zimmerman's business. Such acts are not only enough to show participation in the conspiracy but they are also enough to show an aiding and abetting of it and thus that the defendant was a principal under the statute. Palmero v. United States, 1 Cir., 112 F.2d 922, 924; United States v. Falcone, 2 Cir., 109 F.2d 579, 581, affirmed 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128.

The defendant further contends that the court also erred in admitting into evidence as exhibits a Gold Bond Company ticket and a delivery receipt of the A. B. & C. Motor Transportation Co., Inc., indicating that on January 8, 1938, one package of printed matter was shipped by Standard Press from New York City to Fred Sarno in Fitchburg, Massachusetts, and receipted for by the latter.

The Gold Bond Company, it will be remembered, was the name under which Zimmerman operated before he met the defendant. Both the ticket and the delivery receipt were admitted by the District Court de bene on the assurance of counsel for the government that he would connect them up later. The defendant objected and excepted, but he did not subsequently move that the exhibits be stricken from the evidence and they, with the other exhibits in the case, were given to the jury when it retired.

We need not pause to consider whether or not defendant's counsel was remiss in failing to make a motion to strike the above exhibits because we think that both of them were admissible. Each had some tendency to prove the government's case; the ticket to prove the illegal nature of Zimmerman's activities; the receipt as evidence of one link in the chain of shipment of Will Rogers Memorial Hospital Charity Fund lottery tickets and advertisements from Chicago to Massachusetts.[3]

The defendant also complains of error with respect to the testimony of one Jaffe, who was Zimmerman's counsel at the time when the contract of September 23, 1937, was drawn up and who remained his counsel for some time thereafter. This witness testified that in January, 1938, at his client's request, he told the defendant that thereafter all hospital bills were to be given to him for verification and that, if genuine, he, as Zimmerman's agent, would pay them directly. The trial then proceeded as follows:

"Q. Was there any talk concerning why the change was brought about? A. Yes.

---

[3] The Standard Press & Bindery Co. was the alias of one member of Zimmerman's organization and there was evidence that Will Rogers Memorial Hospital Charity Fund tickets were shipped by Zimmerman's printer in Chicago to the Standard Press in Union City, New Jersey, and reshipped by the latter through New York to Massachusetts.

"Q. What was that talk? A. That wasn't in Dr. Deacon's presence.

"Q. Was Mr. Zimmerman there? A. Yes, sir.

"Q. What was it?

"Mr. Lewis. I pray your Honor's judgment.

"The Court. I will allow it de bene.

"Mr. Lewis. May I have an exception?

"A. Mr Zimmerman told me that he didn't trust Dr. Deacon; that he thought the money that he had already paid him went somewhere else except for the payment of those bills; for that reason he asked me if I would be good enough to pay these bills for him and make sure that the money came to the proper sources.

"Q. And thereafter you paid the creditors of the hospital as directed? A. Yes, sir."

Counsel for defendant then moved that this last testimony be stricken out and the court stated: "I will let it in. I will say to the Foreman and the jury now, in some instances in a conspiracy case such as you have charged here in Count One, as a matter of law if you find that there was a conspiracy existing then any happening that occurred in furtherance of the conspiracy could be used against the conspirator whether he was present or not. If you find that the conspiracy did not exist in so far as this defendent is concerned at that time, I will ask you to strike a lot of the evidence from your minds, from the record."

At this point counsel for the defendant again moved to strike this testimony out. The court denied the motion and counsel excepted.

The court's remarks to the jury were correct statements of the law. Authority on the subject is abundant. But the defendant now contends that his motion to strike should have been granted because the testimony was not material or relevant to any issue, and, in addition, because it was highly prejudicial for the government to introduce testimony tending to show his bad character or reputation before he had put in evidence of his good character.

The testimony was relevant because the payment of the hospital's bills was essential if it was to continue in operation and its continued operation was essential to the maintenance of the lottery which purported to assist in its support. If the testimony, although relevant, was prejudicial, —if it proved too much,—it was the duty of the defendant to suggest to the court below that the jury be instructed to make only a limited use of it. This he failed to do, but advances prejudice as a ground for exclusion for the first time here when it is too late to correct an error which could readily have been corrected at the trial. Under thoroughly familiar principles, this exception must be overruled.

■ Other exceptions taken during the course of the trial relate only to alleged errors with respect to the substantive count. Under the rule of Jarvis v. United States, 1 Cir., 90 F.2d 243, 246, they are not before us for consideration.

The judgment of the District Court is affirmed in respect to the sentence imposed on the first count; the appeal from the judgment in respect to the sentence imposed on the sixty-third count is dismissed as moot.