## UNITED STATES v. SYLVANUS et al.

### Nos. 10104, 10105.

United States Court of Appeals
Seventh Circuit.

April 26, 1951.

Rehearing Denied Dec. 1, 1951.

S. Ashley Guthrie, Voyle Clark Johnson and Fay Warren Johnson, all of Chicago, Ill. and (Tenney, Sherman, Rogers & Guthrie, Samuel R. Lewis, Jr., and John P. Forester, all of Chicago, Ill., of counsel), for appellants.

Otto Kerner, Jr., U. S. Atty., Warren P. Hill, Asst. U. S. Atty., Edward J. Ryan, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

The appeal in 10104 is prosecuted by Alfred Sylvanus and Arcadia National Insurance Company, who were indicted jointly with Voyle Clark Johnson, appellant in 10105. The indictment charged all three defendants in 17 counts with use of the mails in attempted execution of a scheme to defraud in the sale of accident and sickness insurance policies, and in one count, the 18th, with conspiracy to commit the same offense, all in violation of Sections 338 and 88, Title 18 U.S.C. 1946 Edition, now Sections 1341 and 371, Title 18 U.S.C. Counts 5, 7, 8 and 10 of the indictment were dismissed. The jury found all defendants guilty upon each of the remaining 14 counts including that charging conspiracy, and the court entered judgments thereon.

In the two appeals, defendants urge that the District Court erred in, (1), overruling motions to dismiss the indictment; (2), denying motions for acquittal at the end of the government's evidence and at the close of all the evidence and, (3), prejudicial conduct in ruling upon evidence and otherwise in the conduct of the trial. Under (1) defendants suggest that the conduct of insurance business is regulated exclusively by state law and that, in view of the McCarran Act, Secs. 1011–1015, Title 15 U.S.C.A., the acts of Congress relied upon by the government do not apply to the offenses charged; under (2), that the evidence failed to disclose any fraudulent or criminal intent; that the policies offered to the public are not ambiguous but are rather in the form and of the substance required by Illinois law; that the advertising literature relied upon by the government did not misrepresent any material fact and, finally, that the evidence does not sustain the verdict of guilty upon the conspiracy count. They assert, under (3), that the court improperly admitted certain evidence, wrongfully refused to receive other evidence, prejudicially questioned witnesses and improperly denied instructions tendered by defendants and that the argument of the United States Attorney was unfair and prejudicial.

The indictment charged the use of the mails for the purpose of executing a scheme to defraud upon the part of the corporate insurance company, its president, Sylvanus, and one of its general agents, Johnson. The averments were essentially

100

that the corporation, Sylvanus and Johnson grossly misrepresented the company's accident and sickness insurance policies in advertisements in magazines, almanacs and other publications and in circular letters mailed to prospective customers and that upon ensuing applications, the company issued policies not such as advertised but limited in character, misleading, ambiguous and inconsistent.

 Defendants contended in their motion to dismiss that the indictment was fatally defective because of Public Law 15, 79th Congress, 15 U.S.C.A. §§ 1011–1015, popularly referred to as the McCarran Act, which provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance * * *." It is clear, we think, that, by this legislation, the Congress established a public policy upon the part of the national government to refrain from interference with the regulation and taxation of insurance companies by the several states. Consequently, defendants insisted and renew the argument here, that inasmuch as it was the intent of the Congress to remove the federal government from all regulation of insurance companies and, inasmuch as this prosecution involved the propriety of the operation of the business of Arcadia, under the terms of the McCarran Act the court was without jurisdiction to entertain and determine the cause. However, we believe that it can not properly be said that this indictment has to do with the regulation of insurance business in Illinois. Rather it has to do with the question of whether defendants have used the mails in pursuance of a scheme so to manipulate their authorized regulated business in Illinois as to result in fraudulent deception of its prospective policy holders. The charge is not that the corporate charter should be ignored or that the administrative officers of Illinois may not perform their statutory duties and supervise and regulate the company's insurance business in Illinois, but goes to the use of the mails,

over which the Congress has, by the Constitution, paramount power and authority. It matters not that the alleged fraudulent actors might be prosecuted under the law of Illinois. The indictment charges simply that acts of deception amounting to a scheme to defraud have been committed by defendants, in conducting their authorized business, and that defendants have availed themselves of the mails in execution or attempted execution of that scheme. It is immaterial that the fraudulent plan itself is outside the jurisdiction of Congress, Badders v. U. S., 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706, or that the scheme charged involved a transaction forbidden by the laws of the state. O'Hara v. U. S., 6 Cir., 129 F. 551.

 We conclude, then, that it was not the intent of the Congress, by its passage of the McCarran Act, to surrender control of the use of the mails or to cease to authorize the federal courts to determine whether the mails have been utilized in attempted execution of a scheme to defraud and that the district court, by entertaining jurisdiction, did not interfere with regulation of the insurance company by the state but properly overruled the motions to dismiss the indictment.

Determination of the propriety of the denial of the motion for acquittal has necessitated extended consideration of the evidence upon our part, in order to ascertain whether it required submission to the jury. Defendant Arcadia National Insurance Company is successor to the Arcadia Mutual Casualty Company, and the Mohawk Insurance Association, in both of which Sylvanus was the essentially interested party, having been president and manager of each. Arcadia has made, from time to time, contracts with various sales agencies. Among them was the International Insurance Agency, which had its office with that of Arcadia. Sylvanus owned 51% of its stock and the remaining shares were owned by other investors in the insurance company. Another was the United States Insurance Agency, owned and operated by defendant Voyle Clark Johnson, a practicing lawyer at 30 North LaSalle Street, Chicago, where he conducted also agen-

cies for some small mail-order institutions. Under his contract he was to receive a commission of 70% of the first monthly premiums and 50% of all renewals. Though Johnson wrote his own advertising copy, he conferred with and submitted it to Sylvanus for approval before it was sent out. Various other agencies had contracts with Arcadia, but their activities, we think, are not essentially important here.

We have before us a voluminous record. It is impossible within the compass of a reasonably limited opinion to mention all the facts. However, it is clear that very glowing advertisements were published in the form of circular letters and magazine advertisements. In various letters concerning security policies L–101 and L–102, it was said: "Think of receiving $25.00 cash, each week, to help you through a long period of disability * * * In addition * * * the policy provides up to $8,000.-00 cash death benefits. * * * Save your loved ones from the Terrible Money Worries that nearly always come when the breadwinner's income is abruptly stopped because of sickness or a sudden accident. Get Your Security Policy at once and know that you will get Quick Cash when you need it. The Security Policy pays up to $8,000.00 cash for accidental death; up to $8,000.00 cash for loss of hands, eyes or feet; up to $1,875.00 cash for loss of one hand or foot; up to $250.00 for sickness; many other liberal benefits, all as plainly specified and clearly explained in the Policy itself. The premium rate remains the same regardless of your age (between 16 and 75) no matter how long you keep it in force. * * * You need no physical examination so there will be no delay in getting your policy and you can then know you are protected. * * * You will be happy to have the protection that supplies the needed cash to pay the bills. * * * You can do little to prevent misfortune coming to your home, but you can and should see to it that your loved ones are provided for should your regular income be stopped by sickness or accident. * * * There has never been a failure of a Mutual Casualty Company in the United States. This is Your Guarantee that you will receive cash benefits promptly as provided in the liberal Security Policy. * * * Get a Policy and know that you will have immediate cash to pay the multitude of bills that come with sickness and accidents."

Concerning the L–102 policy, it was said: "Remember, Sickness—Accident—Tragedy strikes quickly, without warning. Your income stops. There may be weeks without wages. Nothing but bills! bills! bills! They pour in and pile up. You must face bills for Doctors, Medicine, Hospital, and Nursing Care. Bills for Groceries and Milk. Your rent becomes overdue; a few dollars savings left in the bank. . . Gone. Now You Can give yourself and your family the sheltering care of an Arcadia Policy. What marvelous safety it provides. * * * The Arcadia Policy takes care of you, provides sympathetic, true-hearted protection. This wonderful policy brings comfort, quick aid, ready cash help in time of need. The Arcadia Policy guards you against expense of Sickness and Accident; against the possibility of lost income. It protects you, gives your family quick cash to pay the bills. It brings wonderful cash benefits. . . . at a time when you need cash most . . when all your money is pouring out, nothing coming in. Wonderful Benefits With Payment Guaranteed. * * * No Medical Examination required. * * * The payment of benefits is Guaranteed by this old reliable insurance Company. Each and every claim Must Be Paid strictly in accordance with provisions of the policy. Thousands and thousands and thousands of dollars have already been paid to policyholders. * * * the policy provides up to $3,750.00 cash death benefits, also hospital benefits, identification and financial aid. You are guaranteed against any increase in rates and assessment at any time."

Concerning the so-called "complete coverage" policy L–105, the Arcadia wrote: "When illness or injury disables you, you want to be certain that cash will always be available to pay for Doctors, Medicine, Hospital and other necessities to put you back on your feet. $3,000.00 in case of accidental death, $3,000.00 for loss of limbs or sight, $100.00 per month for sickness,

$100.00 per month for accident, Additional benefits for hospitalization, * * * non-disabling injuries, * * * or emergencies. Refund of premiums with compound interest in case of accidental death. Women, too, can have this 8-way unlimited protection and without extra cost." In another letter it was said: "Think of this: The 'American Sentinel' Policy is not a limited policy . . . definite benefits are paid for sickness or accident. What's more, there is not one extra penny of cost to women." Many other letters varying somewhat in tone but containing the same or similar representations with regard to each of the policies were received in evidence.

Typical examples of the magazine advertising follow: "Get a Security Policy so you will get cash quick when you have worrisome bills to pay. We mail you check every week as specified in Policy to help you pay your bills in time of adversity. Pays cash weekly when you need financial help. Pays up to $5,000.00 cash accumulated benefits for accidental death, loss of hands, eyes, or feet; $25.00 cash weekly for sickness; $25.00 cash weekly for accidents, all as specified in policy. $5,000.00 accumulated benefits for accidental death, $100.00 per month for accident, $100.00 per month for sickness, $100.00 emergency cash, $100.00 hospital expense. * * * The fully guaranteed Arcadia Sickness and Accident policy, offered by a staunch-old reliable company pays cash quickly for sickness or accident. No quibbling or red tape. No ifs, ands, or buts . . . At the amazing low cost of $1.00 per month, you can collect up to $100 per month for sickness or accident, extra cash for hospital care, and up to $3,000 for loss of life, limbs or sight. '3¢ a day pays you 100 a month; pays your family $3,000 in sickness and accident.' "

Concerning the "complete coverage" policy, advertisements in various magazines read as follows: "Here is a policy without any loopholes. No ifs, ands or buts about this insurance. No tricky wording or legal catchphrases to keep you from collecting should sickness or accident befall. Every word of this policy is clear and understandable. * * * Thousands of claims paid. Any man or woman between the ages of 16 and 75 may apply for this wonderful policy without physical examination."

Defendant Johnson wrote similarly; among his statements were: "Remember, Sickness—Accident, Tragedy strikes quickly, without warning. Your income stops. There may be weeks without wages. Nothing but bills! bills! bills! They pour in and pile up. You must face bills for Doctors, Medicine, Hospital, and Nursing Care. Bills for Groceries and Milk. Your rent becomes overdue; the few dollars saving left in the bank . . . Gone! Now You Can give yourself and your family the sheltering care of an Arcadia Policy. What marvelous safety it provides. * * How comforting it is to know that your own loved ones need never wonder about money on hand when sickness or accident strikes. I am particularly glad you are taking steps to apply for this wonderful policy that protects you in so many ways— the kind of insurance you need in times like these. The 'Arcadia' Policy protects you twenty-four hours a day, seven days a week, every single week in the year. * * The 'Arcadia' Policy takes care of You, provides sympathetic, true-hearted protection, * * * brings comfort, quick-aid, ready cash help in time of need, guards you against expenses of Sickness or Accident; against the possibility of lost income. It protects you, gives your family quick cash to pay the bills. It brings wonderful cash benefits . . . at a time when you need cash most . . . when all your money is pouring out, nothing coming in. * * * If you are between the ages of 16 and 75 you can apply. No Medical Examination required. You can have this valuable document that pays maximum benefits of $5,000.00 for specified accidental death, or for specified loss of hands, feet, or eyesight; benefits of $25.00 each week for specific accidents, and $100.00 per month monthly benefits for disability due to sickness—Money for Emergency Aid, doctor bills, hospital, nurses—all the above as stated clearly in the amazing Arcadia Policy. * * * Cash is certainly what you need when you are laid up—it takes

cash—real cash money to pay the doctor, nurse, landlord, for medicines, food and all the other bills that pile up so fast. Yes, you should have the sheltering protection of an Arcadia Policy. * * * Please realize that your situation is far more serious than you may believe. * * * I am surprised that you have not sent your application for the wonderful 'Arcadia' policy I offered to send you on my 10-day Free inspection plan, all without risk of a cent on your part. * * * Surely you want to protect your family, and you can depend on * * * policy—just read the 'Arcadia' policy and see how it pays up to $5,000.00 Maximum for accidental death, loss of hands, feet or eyes. Maximum of $1,875.00 for loss of one foot or hand, and how you get large cash monthly payments if disabled by Sickness or Accident, all as plainly specified and explained in the policy itself. * * * Only a limited number of these 'Arcadia' Policies are to be issued and you should get yours Now, Don't delay." Similar statements were made in his advertisements.

This and other evidence tended to show substantial misrepresentation in the circular letters and the advertisements as charged in the indictment. Thus it was repeatedly stated that, under the Security policy, the company would pay $25 a week and $100 a month for sickness and accident yet, under the policy, the payment of these benefits was conditioned upon the occurrence of certain specified accidents and certain specified illnesses. Again it was repeated, without reservation, from time to time, that there were benefits of $5000 to $8000 for accidental death; yet these were payable only if the policyholder was injured while riding in a public carrier and only if the policy had been in force for at least five years. Furthermore the policy contained a 30-day minimum disability period. With regard to the "complete coverage" policy the literature declared that the policy would pay $100 for sickness and accident and $3000 for death, loss of limbs or sight; however, the policy provides only $25 for sickness and $50 for accident, for the first month of disability. Furthermore the promise to pay $3000 triple indemnity is

hedged about in the policy by strict qualifying conditions. Defendants repeatedly stated in their literature that anyone between the ages of 16 and 75 could be insured without physical examination, whereas the policy shows that all benefits are reduced by one-half after the age of 60 and that the company reserves the right to investigate for pre-existing disorders whenever a claim is made. Obviously the promise to insure without examination tended to mislead each applicant as to the binding effect of the policy. Defendants further advised the public that both men and women could apply at the same premium rate, yet the policies provide that diseases of organs not common to both sexes are excluded, a qualification not appearing in any of the advertising literature. In much of the matter mailed is found a statement that $100 will be paid as an emergency cash benefit, yet Part XI of the Security and Part XII of the Complete Coverage policies provide that this refers to the minimum expenses which the company will defray in putting a stricken insured in touch with friends and relatives. Obviously such an expenditure would very rarely if ever accrue. It was stated that the complete coverage policy had "no loopholes, no ifs, ands, or buts, no tricky wording and no legal catchphrases" to prevent the policyholder from collecting should sickness or accident befall. Other statements such as "thousands of claims have been paid," "only a limited number of policies are to be issued" and "payments of benefits are guaranteed by a staunch-old reliable insurance company" were untrue. All the advertising promised "quick cash when you need it most" yet there was an average of 52 days delay between the filing of the claim and final disposition. The testimony of policyholders tended to show that various of the inducements to the applicants contained in the letters and advertising had been actually misleading.

Under Section 149, Illinois Insurance Code of 1947, Smith-Hurd Revised Statutes, Section 761, Ch. 73, no company is permitted to publish misleading advertisements, and any representative or employee who violates the statute is subject to pen-

alty. Pursuant to this act, in January 1940, the Illinois Insurance Department asked the company to submit all advertising material then being used or which had been used during the preceding six months. Shortly later the Department wrote that it had examined the material submitted and that it had observed that certain general maximum statements were contained therein regarding the terms of policies which appeared to be "misleading if not misrepresentative" citing as an example the statement that the fact that there had never been a failure of a mutual casualty company in the United States was a guarantee that cash benefits would be received promptly. The statement of fact, said the Department, was not true. The Department also criticized the statement that the policies provide protection up to $8,000 for accidental death with no physical examination, whereas in fact they actually provide a maximum death benefit of $8,000.00 only after the policy has been in continuous force for a period of five years and then only if death is caused by the wrecking of a railroad car, subway or interurban railroad car, electric street car or steamboat in which the insured is riding as a fare-paying passenger, if the insured is not over 60 years of age, for, under the policies, after 60, all benefits are reduced one-half and a benefit of only $100 is provided for all other accidental deaths. As a result of continued correspondence, the Department directed that no advertisement be published unless first approved by the Commission.

On June 3, 1940, the Department directed changes in certain representations and returned four circular letters with its suggested corrections noted thereon. The company, on June 6, submitted to the Department proposed letters embodying most of the suggestions, and the Department, on the following day, wrote that with one exception there would be no objection to the use of the proposed forms. The final step in the correspondence occurred on November 27, 1940, when the Director wrote that, under the existing circumstances, he believed the company now understood the wishes of the Department and, therefore, if it would comply therewith, it would not be necessary to furnish other copies. He cautioned, however, that inasmuch as the public is usually easily confused because it is easy going, trustful and tolerant, an insurance company which hopes to serve the public must act so honestly and straight-forwardly as to win the respect and confidence of prospective policyholders. He warned that it was not to be understood that the Department was waiving any of its duties with respect to advertising which misrepresented the terms of the policies advertised. In another statement the Department said: "Emphasis in advertising of maximum benefits by identifying the amounts of policies on the basis of double, triple and multiple indemnities shall not be made without sufficiently referring to smaller benefits (if any) that are payable for losses more likely to occur. An offer of free inspection of a policy, while not objectionable in principle, is not considered as a cure for misleading statements in advertising." It does not appear that the corrected advertising matter was ever actually used by the company. Much of the material we have discussed was published subsequently to the correspondence with the Department. It is apparent that it contained most if not all the features which the Department had previously found objectionable.

The policies in issue are clearly limited policies. L–101 and L–102 are referred to as "Security" policies; L–105 as a "Complete Coverage" policy, and each has been approved by the Illinois Department of Insurance. It is unnecessary to comment upon them at length. As we have seen, they are hedged about with multifold specific limitations and conditions and, though not in themselves illegal, are far from being what the company and its representatives said in advertising material they would be. This is not a contract case between policyholder and insurance company, where the parties deal at arm's length, but rather one where the essence of the charge is that the advertising described the policies as substantially full coverage in character and effect whereas in fact they were far from such. An unsuspecting gullible public, in the natural

course of events, could only have been misled by the terms of the advertising. The applicants, relying upon the representations, had a right to believe that they were getting the kind of policy advertised. What they got was something entirely different.

We shall not undertake a discussion of the voluminous testimony of witnesses who applied for and received policies. Suffice it to say that it tended to support the government's theory and the charge in the indictment.

██ Both Sylvanus and Johnson insist that the record contains no proof of fraudulent intent. In this connection they urge that, regardless of any promises or representations, the offer of refund after inspection of the policy by a prospective insured, negatived any basis for a finding of fraud. Under repeated decisions, the purchaser is entitled to rely upon the representations made. He need not distrust what is told him. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141. The statute was intended to protect the gullible, the ignorant and the over-credulous as well as the more skeptical. Whitehead v. U. S., 5 Cir., 245 F. 385; Rudd v. U. S., 8 Cir., 173 F. 912. It goes without saying almost that it is extremely difficult for a layman to understand the terms and conditions of such policies as these, but whether the applicants did or did not read and understand the policies is beside the point. The question was whether, upon the whole record, the representations were fraudulently made and this was a question for the jury.

██ Considering all of the evidence submitted in support of the charge and keeping in mind the appeals dealing with loss of life or health, financial difficulties, procuring food in times of stress, all strongly emotional in effect, though purporting to deal with a business venture, we conclude that it cannot be said that the trial judge should not have submitted the issue to the jury. This is not a trial de novo. We do not weigh the evidence but determine only that it was such that

the court did not err in denying the motion for acquittal.

Johnson contends that no evidence connects him with the scheme. However, it is clear that he worked closely with Sylvanus and Arcadia; that his advertising was subject to the same criticism as that of the company; that Arcadia, Sylvanus and Johnson were co-workers in the same cause. Johnson knew what the policies were; indeed he was bound to know what they were, for one is required to know of matters pertaining to his own business and if he makes representations with reference thereto, not knowing whether they are true or false, cannot complain if he is convicted. Knickerbocker Merchandising Co. v. U. S., 2 Cir., 13 F.2d 544; Bentel v. U. S., 2 Cir., 13 F.2d 327, 329. A purchaser is entitled to rely upon representations made in advertising and not mistrust what is told him by the seller. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141. Johnson's misrepresentations in his attempts to sell what he advertised, was evidence tending to show that he had identified himself with the scheme and with the conspiracy which the jury found existed. Whether the scheme had being and whether the conspiracy existed, as we have said, were questions of fact for the jury.

Johnson also complains that he was found guilty on certain counts as to which his innocence is clear. As to this, it is sufficient to observe that there was indisputably, evidence to support a finding of guilty upon the 18th and certain other counts and that the sentence imposed upon him was justified by the verdict upon any one of them. Thus, he was sentenced to 18 months in prison, whereas he might have been confined for a longer period; a judgment sustained by one or more valid counts is not defective.

██ Defendants urge that the fact that it was not proved that the victims saw certain of the advertising material upon which the government relies is fatal to the success of the prosecution. This contention overlooks the essential nature of the offense charged. Defendants were not ac-

cused of defrauding the so-called victims; and it was wholly irrelevant as to whether those witnesses saw any or all of the advertising sent through the mails. The question is whether what was sent through the mail was part and parcel of a scheme to defraud. Success of the undertaking was not essential to completion of the statutory violation; likewise whether in fact anybody was in the end defrauded was not the deciding question. Communication of false representations to the victims need be neither alleged nor proved. Graham v. U. S., 10 Cir., 120 F.2d 543; Hyney v. U. S., 6 Cir., 44 F.2d 134. That it is immaterial whether an unlawful scheme succeeds in defrauding victims, see U. S. v. Carruthers, 7 Cir., 152 F.2d 512, certiorari denied 327 U. S. 787, 66 S.Ct. 805, 90 L.Ed. 1014, rehearing denied 327 U.S. 817, 66 S.Ct. 816, 90 L.Ed. 1040; U. S. v. Feldman, 2 Cir., 136 F.2d 394, affirmed 322 U.S. 487; Norman v. U. S., 6 Cir., 100 F.2d 905, certiorari denied 306 U.S. 660, 59 S.Ct. 790, 83 L.Ed. 1057; Muench v. U. S., 8 Cir., 96 F.2d 332.

■ Defendants assert that evidence of only overt acts occurring within three years prior to the return of the indictment could properly have been submitted to the jury. But if the jury was satisfied that a conspiracy had begun more than three years before the return of indictment and had continued in its entirety thence forward and that defendants participated therein, it had a right to consider everything that occurred which contributed to its genesis or proved its existence. In United States v. Cohen, 2 Cir., 145 F.2d 82, 94, the court said: "a condition (requirement of an overt act) interposed to prevent the conspiracy from becoming a crime until the parties have done something to effectuate it, cannot in reason be said to end as soon as it begins, and to require revival by some later step. De facto that is absurd; de jure, it identifies the conspiracy with the act. Finally, the practical consequences of such a doctrine would be most serious; conspirators would secure immunity if they agreed to seek cover, and awaited a propitious moment

to resume their activities." If a defendant is shown to have become connected with a conspiracy evidence of all things done prior to his connection becomes competent against him. Van Riper v. U. S., 2 Cir., 13 F.2d 961; Deacon v. U. S., 1 Cir., 124 F.2d 352; Coates v. U. S., 9 Cir., 59 F.2d 173; U. S. v. Campagna, 2 Cir., 146 F.2d 524, 530; U. S. v. Buckner, 2 Cir., 108 F.2d 921.

■ Defendants have much to say about regulation and supervision of the insurance company by the Department of Insurance of the State of Illinois. As we have suggested, this case has nothing to do with the regulation of insurance companies. If defendants, in conducting an otherwise legal business, engaged in a fraudulent course of conduct, whether that conduct was or was not approved by the state administrative office is wholly immaterial. What the state said in this respect in its communications to the defendant company was one of the circumstances bearing upon the question of good faith, Hawley v. U. S., 6 Cir., 133 F.2d 966, but not decisive of the ultimate issue.

Defendants insist that the conduct of the trial was prejudicial, and assign as error the trial court's rulings on evidence, its interrogation of Sylvanus and Francis, a witness for the defense, and its refusal to give to the jury certain instructions tendered by defendants. The allegedly erroneous evidentiary rulings and the court's interrogation of Sylvanus both relate to the subject of loss ratios, concerning which the court admitted certain evidence offered by the government although excluding evidence relative thereto which defendants sought to introduce. It is defendants' position that the district court erred initially in admitting, over their objection, the testimony of the government's witness as to the loss ratios developed on the policies sold by defendants, but that, having admitted that testimony, as well as Sylvanus' computation of Arcadia's loss ratios for the years 1941 to 1946, and having examined Sylvanus at some length on the subject, the court should have allowed Sylvanus to testify concerning the loss ratios developed on similar

policies sold by other companies and should have received in evidence a publication entitled "Spectator Pocket Register of Accident Insurance", in which was listed the loss ratios of the various companies in the health and accident insurance fields.

 In arguing that the loss ratios on the policies issued by Arcadia were not material to any of the issues involved, defendants reiterate their contention that the only question for determination in the court below was whether the policies sold by defendants fairly set forth the risks to be covered, the indemnities to be paid, and the applicable limitations and exceptions. If this contention were correct, i. e., if the only question presented was whether the policies themselves were fraudulent on their face, it would be true that evidence as to the loss ratios developed by the policies should not have been admitted. Here, however, as the trial court pointed out on several occasions in the course of the proceedings below, there was also presented the further question as to whether the defendants had sold one policy and delivered another, whether, in the advertising material employed by them in order to sell their insurance, they had fairly described the policies actually delivered or whether such advertising contained "false and fraudulent representations", as charged. We think it clear that it cannot be said that the evidence as to loss ratios was immaterial to a determination of whether or not the policies afforded the "amazing" protection claimed for them in the material published and distributed by defendants. Nor does the trial court's interrogation of Sylvanus on this subject appear to have been prejudicial or, for that matter, anything other than a patient and praiseworthy attempt to draw from the witness, for the benefit of the jury, a simplified explanation of the concept under discussion. Nowhere in the record is there any support for defendant Sylvanus' assertion that, "In that examination, the trial judge assumed that the policies in suit have a loss ratio of 10% and policies of some other companies have 90%" ; it is, on the contrary, abundantly clear that the use of the named percentages was for solely illustrative purposes and was restricted to purely hypothetical questions.

 Defendants' argument that the court below, having admitted the government's evidence relative to the loss ratios developed by the policies sold by defendants, erred in refusing to admit similar evidence offered by the defendants relative to the loss ratios on certain health and accident policies issued by other companies must also be rejected. The proffered evidence consisted of computations made by Sylvanus on the basis of information contained in a booklet entitled "Spectator Pocket Register of Accident Insurance", along with the book itself. Wholly aside from the fact that Sylvanus' qualifications were not properly shown and that no proper foundation was laid for the introduction in evidence of the booklet, the evidence was inadmissible because it was immaterial, for the fact that the loss ratios developed by the policies sold by defendants were the same as or greater than the loss ratios on similar policies sold by other companies would have not the slightest tendency to prove that defendants had not made false and fraudulent representations as to the benefits and protection afforded by their own policies, and it was this issue to which the government's evidence as to loss ratios related. Consequently, we conclude that the exclusion of defendants' proffered evidence was proper.

Defendants also assign as error the interrogation of Arcadia's former secretary, Francis, concerning his financial interest in the company, and certain other rulings on evidence. The record contains not the least suggestion that the court's examination of Francis, which was very brief, was prejudicial to the defendants, nor is there, in the entire record, any basis for defendant Johnson's unsupported accusation of "inadvertent participation" in the conduct of the trial on the part of the trial judge or for the assertion that "his rulings and comment, in manner and form, made him the 13th juror". With respect to the court's ruling on the government's objection to a question asked, on cross-examination, of the witness Lichtenbert, it is clear that the

inquiry, which related to the witness' recollection of having mailed certain advertising material to the Department of Insurance, was not within the scope of the direct examination and that the government's objection that it constituted improper cross-examination was properly sustained. And exclusion of defendant Sylvanus' proffered tabulation of the number of applications received, the number rejected, and the number of refunds made on rejected policies can hardly be said to have been erroneous in the light of Sylvanus' own uncertainty as to how and by whom the tabulation had been made

Defendant Johnson's objections to the court's rulings on evidence reflect and grow out of his position that he was not chargeable with the acts and declaration of the other defendants prior to the time of his association with Arcadia or with the acts and declarations of the company's other agents at any time whatsoever. This position, however, is not sound, for the law is that the act of an agent is the act of his principal and that the act of one conspirator is the act of all. Pandolfo v. United States, 7 Cir., 286 F. 8, 17; Lefco v. United States, 3 Cir., 74 F.2d 66, 68; Bogy v. United States, 6 Cir., 96 F.2d 734, 741; Blue v. United States, 6 Cir., 138 F.2d 351, 361. We have observed that the evidence against Johnson upon the issue of whether he participated in the scheme or cooperated in the alleged conspiracy was sufficient to justify submission to the jury. The jury having found in the affirmative upon that issue, the acts and declarations of any and all agents of or participants in the conspiracy bound Johnson as well. Such is the holding of the cases last cited. Thus in Lefco v. United States, 3 Cir., 74 F.2d 66, 68, the court said: "Common design is the essence of conspiracy. The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result. * * * All conspirators need not be acquainted with one another, nor need they have originally conceived or participated in the conception of the con-

spiracy. Those who come on later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before." To the same effect are McGunnigal v. United States, 1 Cir., 151 F.2d 162; United States v. Manton, 2 Cir., 107 F.2d 834; Martin v. United States, 10 Cir., 100 F.2d 490.

It is contended that the court erred in refusing to give certain instructions tendered on behalf of one or more defendants. The first of these, an instruction relative to circumstantial evidence, which read, "Where the guilt of any defendant depends entirely upon circumstantial evidence, then the burden rests upon the government to prove its case not only beyond a reasonable doubt but to the exclusion of any reasonable hypothesis of innocence," was properly refused, irrespective of whether it was a correct statement of law, because it was not applicable, as there was, in this case, no defendant as to whom only circumstantial evidence was offered. Moreover, the court had given a full and adequate charge on the subject of circumstantial evidence. Similarly with respect to the requested instruction on constructive fraud, which was denied because, in the words of the District Judge, "There is not any constructive fraud in this case and there is no use instructing the jury about it. They are all guilty of actual fraud or not guilty at all." And here also, inasmuch as the court had charged the jury that it must find all the elements of actual fraud or acquit the defendants, its refusal to give the requested instruction was neither erroneous nor prejudicial.

Our conclusion that the McCarran Act does not immunize an insurance company whose operations are subject to state regulation from prosecution for violation of the mail fraud statute, without more, requires rejection of defendants' insistence that the trial court erred in refusing to instruct the jury that neither (1) policy limitations or provisions approved or required by the State Department of Insurance nor (2) advertising materials to which the Department had expressed no ob-

jection could be regarded as evidence of any of the elements of the offense with which they were charged. With reference to the effect of the State's approval of the limitations contained in the policies, the court correctly charged the jury that this was a circumstance to be considered on the question of defendants' good faith, but that it did not necessarily mean that any approved policy forms could be so misused or so misrepresented as to violate the federal law.

■ Defendants tendered an instruction to the effect that it is the duty of an insured to read his policy in order to ascertain the conditions contained therein and, if it is found unsatisfactory, to object thereto. Such may be the law in a suit on the policy itself, Bowers v. Washington Times Co., 62 App.D.C. 112, 65 F.2d 200, but it is not applicable here. That the policyholders, by reading their policies, might have ascertained the conditions and limitations contained therein would not alter the fact that the policies had been misrepresented, nor would it absolve defendants from responsibility for having made and transmitted such misrepresentations through the mails. And the requested instructions which stated that proof that defendants submitted the policies to the applicants for inspection and offered to and did refund premiums paid in the event of rejection was evidence of lack of criminal intent, and which the trial court refused to give for the reason that "you cannot take out one element and say it is evidence of lack of intent", were clearly properly denied, for the facts emphasized by the defendants therein do not conclusively establish lack of criminal intent on the part of the defendants but are merely facts to be weighed and considered by the jury, along with and in the light of all the other relevant circumstances, in determining whether defendants acted in good faith. With respect to that question, the jury was properly instructed that, "If you believe, after considering all of the evidence in the case, that the defendants * * * were acting in good faith and with honest purpose in connection with their activities, you must acquit those defendants."

■ Defendant Johnson complains of the trial court's refusal to give two instructions relative to his relationship with the other defendants, the first stating that his "relation to the business described in the indictment was that of an agent" and that, so long as he acted in good faith in reliance on instructions from Arcadia's officers, he was not guilty, and the second charging that the mere fact that he knew Sylvanus during the period in question was not sufficient to support a charge of conspiracy. The court declined the first, stating: "The mere fact that Mr. Johnson entered into an agency contract with the insurance company does not mean he could not be a conspirator. It would be misleading for me to say that he is merely an agent, and that is what the instruction would say * * *", and refused the second "because it is seeking to add emphasis to an evidentiary fact." The court's action was proper in both instances. Furthermore the charge as given made it quite clear to the jury that the fact that Johnson was an agent of Arcadia, or the fact that he knew Sylvanus, without more, was not sufficient to support a verdict of guilty against him. The jury was fully and properly charged; the court did not err in refusing to give any tendered instruction.

Defendants' final contention is that the closing argument of the United States Attorney was prejudicial. Defendant Johnson does not particularize his accusation and defendant Sylvanus goes no farther than to refer to certain arguments which, he says, "were not based on any material evidence, and were unfair and prejudicial." The charges of unfairness are based on premises which have already been examined and found untenable, such, for example, as defendants' contentions with respect to the effect of the approval of the terms of a policy by the State Department of Insurance, the duty of a policyholder to read his policy, and the admissibility of evidence relative to loss ratios. The record does not support the accusation that the arguments referred to had no foundation in the evidence.

The judgments are affirmed.